UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| KEVIN P. CLANCY, IN HIS CAPACITY AS LIQUIDATING TRUSTEE FOR THE NEW ENGLAND MOTOR FREIGHT LIQUIDATING TRUST, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Civil Action No. |
| v. | ) ) | 3:21cv535 |
| UNITED HEALTHCARE INSURANCE COMPANY | ) ) ) | |
| **Serve:** C T Corporation System, Registered Agent 4701 Cox Road, Suite 285 Glen Allen, Virginia 23060 | ) ) ) ) ) ) | **TRIAL BY JURY IS HEREBY DEMANDED.** |
| **and** | ) ) | |
| HPHC INSURANCE COMPANY, INC. | ) ) | |
| **Serve:** Tisa K. Hughes, Resident Agent 93 Worcester Street Wellesley, Massachusetts 02481 | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## COMPLAINT

Kevin P. Clancy ("**Plaintiff**" or "**Liquidating Trustee**"), in his capacity as the Liquidating Trustee for the New England Motor Freight Liquidating Trust (the "**Liquidating Trust**"), by and through his undersigned counsel, hereby asserts the following claims against United HealthCare Insurance Company and HPHC Insurance Company, Inc. (collectively, "**Defendants**" or "**UHC**") and respectfully states as follows:

# INTRODUCTION

1.      Prior to February 2019, New England Motor Freight, Inc. ("**NEMF**"), and its subsidiaries offered a broad range of transportation services in the Mid-Atlantic, Midwest and Northeast United States.  NEMF was a leading less-than-truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States. In addition to the LTL business, NEMF and its Subsidiaries (as defined below) provided and offered: (i) truckload ("**TL**") services through Eastern Freight Ways, Inc. ("**Eastern**"); (ii) trucking equipment leasing through Jans Leasing Corp. ("**Jans Leasing**"); (iii) dedicated third-party logistics services through Carrier Industries, Inc. ("**Carrier**"); (iv) transportation brokerage services through Apex Logistics ("**Apex**"); and (v) non-vessel operation common carrier operations between the United States and Puerto Rico through NEMF World Transport, Inc. ("**NEWT**").

2.      To cover the health care needs of their employees and their employees' spouses and children, NEMF self-funded an employee health insurance plan (the "**NEMF Health Plan**") for NEMF's and its Subsidiaries' employees governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et. seq., ("**ERISA**").  From 2008 to 2020, UHC served as the third-party claims administrator ("**TPA**") for the NEMF Health Plan.  In its role as the TPA, UHC approved and paid more than $172 million in benefit claims from the NEMF Health Plan between 2014 and 2020.

3.      In November 2020, the Liquidating Trustee issued a subpoena to UHC for its records concerning the NEMF Health Plan.  Nine months later, as of the commencement of this action, UHC has refused and failed to comply with the subpoena despite the Liquidating Trustee's good faith efforts to obtain same. Instead, UHC only has produced a limited set of records.  It is now clear why.

4.      The Liquidating Trustee—together with the assistance of his consulting industry expert—has reviewed the limited data that UHC has produced to date, in addition to NEMF records. The information that UHC produced exposes a troubling history of UHC breaching its fiduciary duties by failing to adequately review, investigate, deny and prevent the payment of invalid healthcare claims. This evidence explains why UHC has refused to produce all relevant information and documents concerning its role as TPA for the NEMF Health Plan.

5.      On their face, UHC's records reveal a TPA that improperly reviewed and paid 5,911 claims to medical providers—*i.e.*, an amount in excess of seven percent of the total processed claims in that data. Accordingly, in a case in which UHC administered more than $172 million of NEMF Health Plan assets over the period from 2014 to 2020, the Liquidating Trustee has evidence that UHC improperly paid at least $12 million to providers.

6.      In addition to these improper payments, UHC's records also reveal that it overcharged or failed to credit millions of dollars in overbillings to the NEMF Health Plan. Whereas the NEMF Health Plan records show tens of millions of dollars of withdrawals over the period from 2017 to 2019, UHC's records reflect far fewer payments to providers. This troubling discrepancy imparts additional injury from overbillings, over the period from 2014 to 2020. The Liquidating Trustee files this Complaint to restore the losses suffered by the NEMF Health Plan suffered from UHC's breaches of its fiduciary duties, including UHC's failure to adequately detect and prevent the payment of improper medical claims and its overpayments to providers.

**JURISDICTION, VENUE AND STATUTORY PREDICATES**

7.      This Court has exclusive subject-matter jurisdiction over this action pursuant to 29 USC § 1132(e)(1) and 28 U.S.C. § 1331.

8. This Court has personal jurisdiction over each Defendant pursuant to 29 U.S.C. § 1132(e)(2). ERISA authorizes nationwide service of process, and UHC does business in United States. UHC regularly does business in the Commonwealth of Virginia, and Defendant, United HealthCare Insurance Company, maintains offices in Richmond, Fairfax and Hampton, Virginia.

9. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2). Throughout the period from 2014 through 2020, the NEMF Health Plan covered NEMF employees located in, among other places, Richmond, Virginia. *See infra* at ¶ 22. During this period of time, UHC administered those Richmond-based employees' claims and wrongfully used NEMF Health Plan assets to make payments to medical providers located in the Eastern District of Virginia, including Richmond, Glen Allen, Mechanicsville and North Chesterfield, Virginia. Accordingly, certain of the transactions, events, activities and omissions that constitute UHC's breaches of fiduciary duty took place in this District and arise out of, and relate to, UHC's contacts with the forum.

10. The statutory predicates for the relief requested herein are sections 1104(a)(1)(B), 1104(a)(1)(D), 1109 and 1132(a)(2) of title 29 of the United States Code.

## THE PARTIES

11. Plaintiff is the Liquidating Trustee for the Liquidating Trust.

12. The Liquidating Trustee has standing as a fiduciary of the NEMF Health Plan to pursue this action against UHC for UHC's breaches of fiduciary duties. The Liquidating Trustee brings this claim under 29 U.S.C. § 1132(a)(2). Section 1132(a)(2) provides that a fiduciary may bring a civil action for "appropriate relief" under 29 U.S.C. § 1109. The Liquidating Trustee seeks appropriate relief in money damages.

13. Defendant, United HealthCare Insurance Company, is a Connecticut corporation with its principal place of business in Hartford, Connecticut. Defendant, United HealthCare

Insurance Company's registered agent for service of process is C T Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

14. Defendant, HPHC Insurance Company, Inc., is a Massachusetts corporation with its principal place of business in Wellesley, Massachusetts. Defendant, HPHC Insurance Company, Inc.'s resident agent for service of process is Tisa K. Hughes, 93 Worcester Street, Wellesley, Massachusetts 02481.

## BACKGROUND

### I.    THE NEMF LIQUIDATING TRUST

15. On February 11, 2019 (the "**Petition Date**"), NEMF, Eastern, NEWT, Apex, Jans Leasing and Carrier, in addition to Myar, LLC, MyJon, LLC, Hollywood Avenue Solar, LLC, United Express Solar, LLC and NEMF Logistics, LLC (collectively, "**NEMF and its Subsidiaries**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"). *See In re New England Motor Freight, Inc.*, No. 19-12809 (Bankr. D.N.J. Feb. 11, 2019) (the "**Chapter 11 Cases**"). NEMF and its Subsidiaries commenced the Chapter 11 Cases to commence an orderly wind-down and liquidation of the majority of their assets and to conduct an auction process for certain of their operations as a going concern.

16. On October 21, 2019, NEMF and its Subsidiaries, together with the Official Committee of Unsecured Creditors, jointly filed the initial version of a combined bankruptcy plan and disclosure statement. [D.I. 932].[1] The parties subsequently amended those materials on

---

[1]    Unless otherwise indicated herein, "**D.I. [ ]**" references are made to the docket of the Chapter 11 Cases.

November 8, 2019 [D.I. 983], and on November 12, 2019 [D.I. 993], and filed final versions on November 19, 2019 [D.I. 1023].

17. The Bankruptcy Court held a confirmation hearing on January 14, 2020, and entered an order approving the disclosure statement and confirming the third amended bankruptcy plan (the "**Bankruptcy Plan**") [D.I. 1123]. The effective date of the Bankruptcy Plan occurred on February 3, 2020 (the "**Plan Effective Date**") [D.I. 1153].

18. On the Plan Effective Date, all of NEMF's and its Subsidiaries' assets, including causes of action, were transferred to and vested in the post-confirmation Liquidating Trust, free and clear of any and all claims and liens, for the uses and purposes set forth in the Bankruptcy Plan and for the benefit of the Liquidating Trust beneficiaries.[2]

19. The Liquidating Trustee oversees and administers the Liquidating Trust, which grants the Liquidating Trustee the authority to bring claims on behalf of the Liquidating Trust, such as this one. [Ex. A, Confirmation Order at 31, ¶ 29].

## II. THE NEMF HEALTH PLAN

20. A self-funded health and welfare plan is one in which the plan sponsor—here, NEMF and its Subsidiaries—has sole responsibilities to pay and provide funds to pay all associated plan benefits.

21. For decades, NEMF self-funded the NEMF Health Plan in compliance with ERISA to cover the health care needs of NEMF's and its Subsidiaries' employees and the employees' spouses and children.

---

[2] A copy of the Bankruptcy Court's *Findings of Fact, Conclusion of Law, and Order Confirming Debtors' and Official Committee of Unsecured Creditors' Third Amended Joint Combined Plan of Liquidation and Disclosure Statement* (the "**Confirmation Order**") [D.I. 1123] is attached and incorporated herein as **Exhibit A**. Among other things, the Confirmation Order established the Liquidating Trust.

6

22. Over the period from 2014 to 2019, NEMF and its Subsidiaries employed an average of more than 100 individuals who worked in Richmond, Virginia. On the Petition Date, NEMF and its Subsidiaries employed approximately 3,450 individuals either on a full-time or part-time basis. After NEMF and its Subsidiaries commenced the Chapter 11 Cases, they began the process of laying off employees. The majority of their employees were terminated on or before April 13, 2019.

23. NEMF and its Subsidiaries maintained health insurance benefits for their remaining employees through July 31, 2019—the date on which the NEMF Health Plan terminated (the "**Termination Date**"). Following the Termination Date, UHC administered a six-month run-off period during which UHC continued to review, approve and pay valid claims for the NEMF Health Plan for services rendered before July 31, 2019.

24. NEMF served as Plan Sponsor and Plan Administrator for the NEMF Health Plan.

25. Because NEMF and its Subsidiaries conducted their operations in the transportation industry—and were not health care companies—NEMF engaged UHC to serve as the TPA to NEMF and its Subsidiaries effective January 1, 2008. The agreement between NEMF and UHC is memorialized in that certain Administrative Service Agreement dated January 1, 2008 between UHC and NEMF (the "**ASA**").[3]

### A. UHC WAS A FIDUCIARY OF THE NEMF HEALTH PLAN

26. In the ASA, the parties expressly designated UHC as the "named, ERISA fiduciary … with respect to," among other things, "performing … benefit determinations" and making "payment[s]." [Ex. B, ASA § 4.2]. In addition to serving as the NEMF Health Plan's named fiduciary, UHC also functioned as a fiduciary by exercising discretionary authority and

---

[3] A copy of the ASA is attached and incorporated herein as **Exhibit B**.

control over the NEMF Health Plan's management and disposition of its assets—as the parties intended under the ASA. [Ex. B, ASA § 4.1 (providing that UHC had "discretion and authority to use … "procedures and standards" "for benefit claim determinations"); § 4.2 (providing that UHC had "discretionary authority to "construe and interpret the terms of the [NEMF health] Plan," "determine the validity of charges submitted … under the [NEMF Health] Plan" and to "make final, binding determinations concerning the availability of [NEMF Health] Plan benefits").

27. As a fiduciary, UHC was required to act in accordance with the documents and instruments governing the NEMF Health Plan (including the ASA), and also was required to act with reasonable prudence in discharging its duties to (i) manage the NEMF Health Plan, (ii) determine whether a submitted claim should be approved or denied, (iii) and pay properly-approved claims using NEMF's funds.

28. UHC received compensation for its services, including fees and commissions.

**B. UHC'S PAYMENTS TO MEDICAL PROVIDERS FROM THE NEMF HEALTH PLAN**

29. After UHC determined that a claim should be paid, UHC was responsible for paying that claim. [Ex. B, ASA at § 6].

30. To fund the payment of claims, UHC "open[ed] and maintain[ed]" a bank account with JPMorgan Chase Bank "under [NEMF's] employer identification number" (the "**Plan Bank Account**"). [Ex. B, ASA § 6.2]. The Plan Bank Account "provide[d] UHC the means to access [NEMF's] funds for the sole purpose of payment of [NEMF Health] Plan benefits, expenses, and fees." [Ex. B, ASA § 6.2].

31. When UHC determined it should pay a claim, it would pay the claim either by check or through a wire transfer. [Ex. B, ASA §§ 6.4, 6.5]. UHC had the authority to write and

issue checks and direct the bank to accept or reject a check upon presentment. [Ex. B, ASA § 6.4]. Similarly, UHC had the authority to initiate wire transfers from the Plan Bank Account to pay health care providers. [Ex. B, ASA § 6.5].

32. NEMF also authorized UHC to initiate automated clearing house transfers from NEMF's corporate bank account to the fund the Plan Bank Account for payment of NEMF Health Plan benefits. [Ex. B, ASA § 6.8].

33. From January 2014 through January 2020, UHC was responsible for: (i) millions of dollars of the NEMF Health Plan's assets by determining which claims should be approved; and (ii) paying approved claims. Over this period, UHC approved and paid approximately $172 million of claims to medical providers through assets that NEMF and its Subsidiaries transferred into the Plan Bank Account.

### III. THE LIQUIDATING TRUSTEE'S INVESTIGATION OF UHC'S BREACHES OF FIDUCIARY DUTIES

34. In August 2020, the Liquidating Trustee engaged a third party to review and analyze data related to the NEMF Health Plan (the "**Consulting Expert**"). The scope of the Consulting Expert's analysis is broad. Among other things, it analyzes historical data to determine if the claims that UHC reviewed and approved were approved consistent with the terms of the NEMF Health Plan and industry standards. The Consulting Expert also reconciles bank and payment records with invoices and insurance documentation.

35. In November 2020, in connection with the Chapter 11 Cases, the Liquidating Trustee caused a subpoena to be served on UHC for a production of documents, covering the period from January 2012 through the Termination Date, concerning UHC's role as TPA for the NEMF Health Plan. In general, UHC has failed to comply with the subpoena and produce documents the Liquidating Trustee sought therein. UHC produced a small volume of records

that include certain claims UHC administered beginning in January 2017 (even though UHC served as the TPA for the NEMF Health Plan beginning in 2008) (the "**UHC Records**").[4]

36. The UHC Records reveal and evidence UHC's significant breaches of fiduciary duties—explaining why UHC has obfuscated, avoided, and delayed production of all responsive data and documents since November 2020. They contain 5,911 examples of UHC failing to properly review a claim and then paying a claim (that, on its face, should not have been paid) from the NEMF Health Plan's assets. In fact, the Liquidating Trustee has identified 24 separate categories of UHC's improperly-approved and paid claims, including the following:

    a. **Age-Specific Claims**. UHC improperly approved and paid tens of thousands of dollars in claims for medical procedures that could not have been rendered given a patient's age. By way of example, UHC used the NEMF Health Plan's assets to pay a claim for a 67-year-old patient who purportedly underwent a medical procedure reserved for individuals younger than seven (7) years old.

    b. **"Add-on" Claims**. As a matter of industry standards and customs, claim administrators do not, and should not, pay a medical provider's claim under an "add-on" code if the provider's claim under a "primary" code was not billed or was denied. In deviation from industry standards and customs, UHC improperly paid hundreds of these claims—all of which should have been denied.

    c. **Gender-Specific Claims**. UHC improperly paid claims for medical procedures that could not have been rendered given a patient's gender. By way of example, UHC paid a medical provider for a pregnancy ultrasound purportedly administered on a male patient. Similarly, UHC paid a medical provider for a vaginal procedure purportedly administered on a male patient.

---

[4] Although the UHC Records contain sufficient data to allow the Liquidating Trustee and his Consulting Expert to review and analyze them, UHC has refused to produce complete records.

d. **Duplicate Anesthesia Claims**. As a matter of industry standards and customs, and pursuant to policies and guidance from the American Society of Anesthesia, claim administrators do not, and should not, pay multiple anesthesia charges merely because a provider performed multiple surgical procedures at one visit. Nevertheless, UHC used the NEMF Health Plan's assets to pay thousands of dollars in duplicate anesthesia claims that should have been denied.

e. **Subrogation Claims**. When a health plan member is injured in an automobile accident, the responsible party's automobile insurance should be billed for any related medical claims. UHC, however, took thousands of dollars from the NEMF Health Plan's assets to pay such claims, which, instead, should have been subrogated and paid by automobile insurance.

f. **"Primary" Surgeon Claims**. As a matter of industry standards and customs, claim administrators do not, and should not, pay more than one "primary" surgeon for a medical service; if multiple surgeons rendered services, only one of them may charge as a "primary" and all others must charge as an "assistant." In deviation from industry standards and customs, UHC paid claims in which multiple medical providers each charged as the "primary" provider.

g. **OIG Exclusion Claims**. The Office of the Inspector General is required by law to exclude medical providers from federal health care programs when they are convicted of certain criminal offenses, including insurance fraud—and the Office of the Inspector General maintains a list of such providers. Here, however, UHC paid claims to providers whose licenses had been revoked or suspended.

h. **Procedure-to-Procedure Claims**. As a matter of industry standards and customs, and pursuant to policies and guidance from the Medicare National Correct Coding Initiative and the Centers for Medicare and Medicaid Services, claim administrators do not, and should not, pay claims for purportedly simultaneous procedures that could not have been performed during one visit—typically based on anatomical, temporal or gender considerations. In contravention of these standards, customs, policies and guidance, UHC paid thousands of such claims representing hundreds of thousands of dollars of the NEMF Health Plan's assets.

i. **Unjustified Claims**. As a matter of law, and industry standards and customs, a claim administrator must keep records sufficient to justify and account for claims administered and paid. Here, the UHC Records contain thousands of dollars in payments that lack any facial justification.

37. In total, the UHC Records reveal that UHC improperly approved and paid more than seven percent of the claims processed in those records. At that rate, over the period from 2014 to 2020, UHC improperly approved and paid at least $12 million to providers from the NEMF Health Plan's assets.

38. In addition to these improperly-paid claims, the UHC Records evidence additional breaches for overbilling the NEMF Health Plan. Specifically, the UHC Records show that UHC paid medical providers approximately $27 million over the period from 2017 through 2019, whereas the Plan Bank Account records reveal that UHC withdrew approximately $81 million of the NEMF Health Plan's assets over the same period. Overbillings constitute breaches of fiduciary duty. They are unacceptable under all circumstances, but they occur (especially when, as here, an insurer is acting as a TPA for self-funded plan and is not using its own funds to pay claims). Indeed, the Liquidating Trustee knows from his Consulting Expert that TPA overbillings represent three to eight percent of the total funds withdrawn from a plan. Even assuming that UHC engaged in overbillings at a rate of eight percent—*i.e.*, a lower rate than what the UHC Records reflect—total overbillings for the period from 2014 through 2020 would represent an additional $14 million of damages to the NEMF Health Plan.

39. UHC reviewed, approved, and paid thousands of claims with the NEMF Health Plan's assets that should not have been approved and paid. Based on the UHC Records, the Liquidating Trustee has concluded that UHC paid more than $26 million in claims that should not have been paid, resulting in losses to the NEMF Health Plan and NEMF and its Subsidiaries.

## COUNT I
**Breach of Fiduciary Duty**

40. The Liquidating Trustee incorporates the foregoing paragraphs of this Complaint as if stated herein.

41. UHC served as a fiduciary of the NEMF Health Plan under ERISA and, thus, owed fiduciary duties to NEMF. UHC cannot disclaim its duties.

42. As a fiduciary, ERISA imposes on UHC a duty of "prudence" and requires UHC to discharge its duties under the NEMF Health Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

43. Additionally, as a fiduciary, ERISA imposes a separate and independent duty on UHC to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

44. UHC breached its fiduciary duties by failing to adequately identify, investigate, deny and prevent the payment of healthcare claims that should not have been paid, resulting in fraud, waste and/or abuse in respect of the NEMF Health Plan's assets.

45. Put another way, UHC did not fulfill its duty to safeguard the NEMF Health Plan's assets and UHC's fiduciary breaches diminished the NEMF Health Plan's assets.

46. As the TPA and fiduciary for the NEMF Health Plan, UHC was required—but failed—to appropriately and diligently process, review, and approve or deny claims for health and pharmacy benefits made to the NEMF Health Plan.

47. NEMF and its Subsidiaries relied on UHC to evaluate millions of claims made to the NEMF Health Plan because UHC held itself out as an expert in the field. Thus, as a purported expert in healthcare-claims administration, and as stated in the ASA, UHC alone made the decision whether to use the NEMF Health Plan's assets to pay claims.

48. UHC's breaches caused injury to the NEMF Health Plan, which resulted in damages in the form of diminished NEMF Health Plan assets. The Liquidating Trustee seeks damages for all improper payments and overpayments made by UHC from the NEMF Health Plan's assets. As explained above, UHC's breaches of fiduciary responsibilities have resulted in millions of dollars in losses to the NEMF Health Plan.

49. Under ERISA, a fiduciary that breaches its responsibilities, obligations, or duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan …." 29 U.S.C. § 1109(a).

50. The Liquidating Trustee is entitled, and seeks, to recover all such losses to the NEMF Health Plan and any profits UHC made through fees and commissions. The Liquidating Trustee also seeks his attorneys' fees, expert expenses, and other costs under 29 U.S.C. § 1132(g).

51. This action has been timely filed pursuant to 29 U.S.C. § 1113.

52. ERISA creates no conditions precedent for the filing of this action against UHC. Thus, there are no unfulfilled conditions precedent to the filing and prosecution of this action.

53. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Liquidating Trustee demands a trial by jury in this action of all claims so triable. To the extent this Court

determines that the claims asserted are not properly submitted to a jury for determination, the Liquidating Trustee requests an advisory jury.

**WHEREFORE**, for the reasons explained above, Plaintiff, Kevin P. Clancy, in his capacity as the Liquidating Trustee for the New England Motor Freight Liquidating Trust, hereby requests this Court enter judgment against Defendants, United Healthcare Insurance Company and HPHC Insurance Company, Inc., in favor of the Liquidating Trustee, on the grounds that:

(i)   UHC breached its fiduciary duties under ERISA;

(ii)  the Liquidating Trustee, on behalf of the NEMF Liquidating Trust, is entitled to all damages sought herein, including costs, expenses, attorneys' fees, and all pre-judgment and post-judgment interest at the maximum allowable rate; and

(iii) the NEMF Liquidating Trust is granted all other legal and equitable relief to which it may be entitled.

Dated: August 17, 2021    KEVIN CLANCY, IN HIS CAPACITY AS THE LIQUIDATING TRUSTEE OF THE NEW ENGLAND MOTOR FREIGHT LIQUIDATING TRUST

/s/ *Vernon E. Inge, Jr.*
Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:   804.977.3301
Facsimile:    804.977.3291
E-Mail:        vinge@wtplaw.com

Todd M. Brooks (*pro hac vice motion forthcoming*)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Seven Saint Paul Street, 15th Floor
Baltimore, Maryland 21202
Telephone:   410.347.9421
Facsimile:    410.234.2318
E-Mail:        tbrooks@wtplaw.com

Joshua D. Stiff (Va. Bar No. 86105)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
249 Central Park Avenue, Suite 300
Virginia Beach, Virginia  23462
Telephone:   757.271.9751 / 804.762.6870
Facsimile:    757.271.9736
E-Mail:        jstiff@wtplaw.com

*Special Litigation Counsel for Plaintiff, Kevin P. Clancy, in his capacity as the Liquidating Trustee of the New England Motor Freight Liquidating Trust*