**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| KEVIN P. CLANCY, IN HIS CAPACITY AS LIQUIDATING TRUSTEE FOR THE NEW ENGLAND MOTOR FREIGHT LIQUIDATING TRUST, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Civil Action No. |
| v. | ) ) | 3:21-cv-535 |
| UNITEDHEALTHCARE INSURANCE COMPANY, *et al.*, | ) ) | |
| *Defendants*. | ) ) | |

**MEMORANDUM IN SUPPORT OF**
**TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. UNDISPUTED FACTS .........................................................................................................3

    A. IN 2008, DEFENDANTS AND NEMF ENTERED INTO THE ASA ..............................................3

        1. NEMF Served as the "Plan Administrator" of the NEMF Plan..................................3

        2. Defendants Served as the "Claims Administrators" of the NEMF Plan......................3

    B. DEFENDANTS' NETWORKS OF MEDICAL PROVIDERS .............................................................4

    C. DEFENDANTS' SERVICES AS CLAIMS ADMINISTRATORS ......................................................5

    D. HARVARD PILGRIM'S FAILURE TO MONITOR UNITEDHEALTHCARE ....................................6

    E. UNITEDHEALTHCARE'S PAYMENT ERRORS ........................................................................6

    F. UNITEDHEALTHCARE WAS AWARE OF ITS CLAIMS-PROCESSING ERRORS ..........................8

    G. UNITEDHEALTHCARE REJECTED EACH OF NEMF'S ATTEMPTS TO INTERVENE ................13

    H. UNITEDHEALTHCARE'S REFUSAL TO PRODUCE REQUESTED INFORMATION .....................16

    I. UNITEDHEALTHCARE'S INSTITUTIONAL POLICY OF NON-DISCLOSURE .............................17

        1. UnitedHealthcare's Payment-Error Façade ..............................................................17

        2. UnitedHealthcare's Refusal to Accept Audit-Proposal Requests..............................19

        3. UnitedHealthcare's Concealment of Material Information ........................................20

            a. UnitedHealthcare Withholds Material Information from
               Plan Administrators During the Sample-Selection Phase of an Audit .................20

            b. UnitedHealthcare Deliberately "Suppresses" Available Information
               During the Sample-Selection Phase of an Audit....................................................23

            c. UnitedHealthcare Requires Plan Administrators to Select a Sample
               Based on Incomplete and Manipulated Information...............................................25

J.   DEFENDANTS' COMPENSATION AS CLAIMS ADMINISTRATORS ...........................................26

   1.   The Extra Fees Defendants Generated from "Recovery" Services ...........................27

   2.   The Extra Fees Defendants Generated from "Savings" Programs ............................28

   3.   Defendants' Motivation for Charging Extra Fees......................................................30

   4.   NEMF Discovers Defendants' Motivation for Charging Extra Fees..........................31

K.   THE BANKRUPTCY CASE AND THE NEMF PLAN'S TERMINATION ...................................31

L.   DEFENDANTS' CONCEALMENT OF EVIDENCE FROM THE TRUSTEE....................................32

   1.   The Trustee's Requests for Underlying Data and Claims Information ......................32

   2.   Defendants Asserted that the Trustee Was Not Entitled to
      the Claims Information and that the Claims Information Was Irrelevant ..................33

   3.   Defendants Limited Their Productions to the Underlying Data...................................34

   4.   In April 2022, the Court Rejected Defendants' Efforts to Limit Discovery .................34

   5.   In July 2022, Defendants Revealed Their Plan to Produce Claims Information,
      But Only for Their Secret 250-Claim Discovery Sample ............................................35

   6.   Defendants Withheld the Underlying Data to Prevent
      the Trustee from Obtaining Any Claims Information....................................................36

   7.   Defendants Now Assert that the Trustee Cannot Prove Any Payment Errors
      Without the Claims Information They Withheld in Discovery ....................................37

III. ARGUMENT ...........................................................................................................................40

A.   SUMMARY JUDGMENT STANDARDS ...................................................................................40

B.   COUNT I:  DEFENDANTS' BREACHES OF THEIR ERISA FIDUCIARY DUTIES....................40

   1.   ERISA Fiduciary Duties Are the "Highest Known to the Law" ................................41

   2.   ERISA Fiduciaries Cannot Contract Around Their Fiduciary Duties ........................41

   3.   The Three Elements of an ERISA Fiduciary-Breach Case.........................................41

      a.   Element 1:  Defendants Were Fiduciaries of the NEMF Plan ..............................41

      b.  Element 2:  Defendants' Breaches of Their Fiduciary Duties ..............................42

          i.  The Duty of Loyalty.............................................................43

          ii.  The Duty to Disclose Material Information....................................45

          iii. The Duty of Prudence ..................................................47

      c.  Element 3:  The Losses Defendants Caused to the NEMF Plan...........................49

          A.  Disgorgement of Defendants' Compensation............................................49

          B.  Damages Resulting from Defendants' Breaches .......................................50

C.     COUNT II:  Defendants' Intentional Concealment of Evidence ...........................51

    1.  The Court Has Jurisdiction over Count II.................................................52

    2.  It Is Undisputed that New Jersey Law Applies to Count II ................................53

    3.  Intentional Concealment under New Jersey Law .........................................54

      a.  Defendants Were Obligated to Produce the Claims Information .........................55

      b.  Defendants Contend the Claims Information Is Material .....................................57

      c.  Defendants Are in Possession of the Claims Information ....................................57

      d.  Defendants Intentionally Withheld the Claims Information................................57

      e.  The Trustee's Damages from Defendants' Concealment ....................................57

    4.  The Trustee Is Entitled to Punitive Damages ..........................................58

IV. CONCLUSION..................................................................................................60

# TABLE OF AUTHORITIES

## Cases

*27-35 Jackson Ave., LLC v. Samsung Fire & Marine Ins. Co.*,
  263 A.3d 200 (N.J. Super. App. Div. 2021) .................................................53, 54

*Acosta v. WH Adm'rs, Inc.*,
  449 F. Supp. 3d 506 (D. Md. 2020) .................................................................43

*Autonation, Inc. v. UnitedHealthcare Ins. Co.*,
  423 F. Supp. 2d 1265 (S.D. Fla. 2006) ...........................................................48

*Band v. Blue Cross Blue Shield of Mich.*,
  183 F. Supp. 3d 835 (E.D. Mich. 2016).............................................................47

*Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Va.*,
  876 F. Supp. 809 (E.D. Va. 1995) .....................................................................50

*Comau LLC v. Blue Cross Blue Shield of Mich.*,
  No. 19-12623, 2020 WL 7024683 (E.D. Mich. Nov. 30, 2020).........................47, 48

*Dawson-Murdock v. Nat'l Counseling Grp., Inc.*,
  931 F.3d 269 (4th Cir. 2019) .........................................................................41, 42

*DiFelice v. U.S. Airways, Inc.*,
  436 F. Supp. 2d 756 (E.D. Va. 2006) ...............................................................47

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) .......................................................................43, 47

*Griggs v. E.I. DuPont de Nemours & Co.*,
  237 F.3d 371 (4th Cir. 2001) ....................................................................43, 45, 46

*Grp. 1 Auto., Inc. v. Aetna Life Ins. Co.*,
  No. 20-1290, 2020 WL 8299592 (S.D. Tex. Nov. 9, 2020) .............................47, 49

*Halperin v. Richards*,
  7 F.4th 534 (7th Cir. 2021) ...........................................................................43

*Hartsfield, Titus & Donnelly v. Loomis Co.*,
  No. 08-3329, 2010 WL 596466 (D.N.J. Feb. 17, 2010) ...................................48, 49

*Helton v. AT&T, Inc.*,
  805 F. Supp. 2d 234 (E.D. Va. 2011) .............................................................43, 45

*Hornady Transp. LLC v. McLeod Health Servs., Inc.*,
  773 F. Supp. 2d 622 (D.S.C. 2011)........................................................................48

*loanDepot.com v. CrossCountry Mortg., Inc.*,
  399 F. Supp. 3d 226 (D.N.J. 2019) .......................................................................53

*Longo v. Trojan Horse Ltd.*,
  208 F. Supp. 3d 700 (E.D.N.C. 2016)....................................................................42

*Nelsen v. Principal Glob. Invs. Tr. Co.*,
  362 F. Supp. 3d 627 (S.D. Iowa 2019) ..............................................................44–45

*Novembre v. New Jersey Nets*,
  No. A-3313-15T3, 2019 WL 3230868 (N.J. Super. Ct. App. Div. July 18, 2019)................58

*Parmer v. Land O'Lakes, Inc.*,
  518 F. Supp. 3d 1293 (D. Minn. 2021)..................................................................44

*Perez v. Chimes D.C., Inc.*,
  No. 15-3315, 2016 WL 5815443 (D. Md. Oct. 5, 2016) ...........................................48

*Perez v. City Nat'l Corp.*,
  176 F. Supp. 3d 945 (C.D. Cal. 2016) ..................................................................44

*Peters v. Aetna Inc.*,
  2 F.4th 199 (4th Cir. 2021) .............................................................40, 41, 43, 50

*Reetz v. Lowe's Cos., Inc.*,
  No. 18-75, 2019 WL 4233616 (W.D.N.C. Sept. 6, 2019) .........................................42

*Robertet Flavors, Inc. v. Tri-Form Const., Inc.*,
  1 A.3d 658 (N.J. 2010)........................................................................54, 55, 58

*Rosenblit v. Zimmerman*,
  766 A.2d 749 (N.J. 2001)........................................................................ *passim*

*Russell v. Harman Int'l Indus., Inc.*,
  945 F. Supp. 2d 68 (D.D.C. 2013) .......................................................................41

*Self Insured Servs. Co. v. Panel Sys., Inc.*,
  352 F. Supp. 3d 540 (E.D. Va. 2018) ....................................................................44

*Simply Wireless, Inc. v. T-Mobile US, Inc.*,
  No. 21-597, 2022 WL 16573997 (E.D. Va. Nov. 1, 2022)........................................40

*Sims v. BB&T Corp.*,
   No. 15-732, 2018 WL 3128996 (M.D.N.C. June 26, 2018) ............................................41, 49

*Stegemann v. Gannett Co., Inc.*,
   970 F.3d 465 (4th Cir. 2020) ...............................................................................................41

*Tartaglia v. UBS PaineWebber Inc.*,
   961 A.2d 1167 (N.J. 2008) .......................................................................................... *passim*

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
   39 F. Supp. 3d 461 (S.D.N.Y. 2014) .....................................................................................45

*Vazquez v. Paul Revere Life Ins. Co.*,
   289 F. Supp. 2d 727 (E.D. Va. 2001) ....................................................................................52

*Viviano v. CBS, Inc.*,
   597 A.2d 543 (N.J. Super. Ct. App. Div. 1991) .....................................................................59

*Williams v. BASF Catalysts LLC*,
   765 F.3d 306 (3d Cir. 2014) ........................................................................................ *passim*

## Statutes

28 U.S.C.A. § 1367(a) (1990) .....................................................................................................52

28 U.S.C.A. § 1367(c)(1)–(4) (1990) .........................................................................................52

29 U.S.C. § 1002(21)(A)(iii) (2019) ...........................................................................................42

29 U.S.C. § 1104(a)(1) (2019) ....................................................................................................43

29 U.S.C. § 1104(a)(1)(B) (2019) ..............................................................................................47

29 U.S.C. § 1105(a)(2) (1974) ....................................................................................................42

29 U.S.C. § 1106(b)(1) (1974) ....................................................................................................43

29 U.S.C. § 1109(a) (1974) ...................................................................................................40, 51

29 U.S.C. § 1110(a) (1974) ..........................................................................................................41

29 U.S.C. § 1132(a)(2) (2014) ...............................................................................................40, 50

29 U.S.C. § 1132(a)(3) (2014) ...............................................................................................40, 50

29 U.S.C. § 1185m(a)(1)(A) (2020) ..............................................................56

29 U.S.C. § 1191b(b)(2) (2016).................................................................56

N.J. REV. STAT. § 2A:15-5.12.a–b (1995)................................................58–59

N.J. REV. STAT. § 2A:15-5.12.c (1995).......................................................59

## **Other Authorities**

GEORGE G. BOGERT, *The Law of Trusts and Trustees* § 541 (2023) ..............................................47

GEORGE G. BOGERT, *The Law of Trusts and Trustees* § 543 (2022) ..............................................50

RESTATEMENT (THIRD) OF TRUSTS § 100 (2012) ..................................................49–50

Plaintiff Kevin P. Clancy (the "**Trustee**"), in his capacity as the Trustee for the New England Motor Freight Liquidating Trust (the "**Liquidating Trust**"), by and through his undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "**Federal Rules**") and Rule 56 of the Local Civil Rules, submits this memorandum in support of the *Trustee's Motion for Partial Summary Judgment* against Defendants UnitedHealthcare Insurance Company ("**UnitedHealthcare**") and HPHC Insurance Company, Inc. ("**Harvard Pilgrim**"), and respectfully states as follows:

## I.  INTRODUCTION

Beginning in 2008, Defendants occupied roles as fiduciaries and "claims administrators" of a self-funded healthcare plan (the "**NEMF Plan**") governed by the Employee Retirement Income Security Act of 1974 ("**ERISA**").  In discovery, the Trustee collected voluminous evidence demonstrating that, over the period from 2014 to 2020, Defendants breached their fiduciary duties under ERISA, which are "the highest [duties] known to the law." *See infra* at 41.

The evidence demonstrates that Defendants breached their **duty of prudence** in two distinct ways.  *First*, beginning in 2014, UnitedHealthcare was aware of, and acknowledged and admitted, that its claims administration was imbued with "errors" resulting in "overpayments," but UnitedHealthcare turned a blind eye to those errors and failed to address and correct them. *See infra* at 8–13.  *Second*, over the period from 2014 to 2020, UnitedHealthcare negligently processed and paid millions of dollars of healthcare claims, including by making blatant overpayments to medical providers; Defendants have no genuine dispute remaining for trial concerning $11,570,866 of those losses to the NEMF Plan. *See infra* at 6–8.

The evidence also demonstrates that Defendants breached their **duty of loyalty** to the NEMF Plan—in three different ways.  *First*, UnitedHealthcare delivered annual self-evaluations to NEMF that misrepresented UnitedHealthcare's performance as a claims administrator and falsely presented its payment-error rates. *See infra* at 17–19.  *Second*, throughout the period from 2014 to 2020, UnitedHealthcare repeatedly rebuffed NEMF's proposals to prevent losses to the NEMF Plan because UnitedHealthcare did not want to disturb its favored, contractual relationships

1

with third-party vendors and medical providers in the healthcare industry. *See infra* at 13–16. *Third*, Defendants increased their compensation by 57% over the period from 2014 to 2020, by extracting fees from the NEMF Plan for, among other things, making payment errors and accepting knowingly "fudged" invoices from medical providers. *See infra* at 26–31.

The evidence further demonstrates that Defendants breached their **duty to disclose information** about the NEMF Plan.  In addition to consistently rejecting NEMF's requests for information about the performance of the NEMF Plan, *see infra* at 16–17, UnitedHealthcare engaged in a deliberate scheme to withhold material information about its performance as a claims administrator. *See infra* at 17–26.  Caught red-handed in discovery, UnitedHealthcare admitted that it hid information about the NEMF Plan in furtherance of its institutional policy of concealing information. *See infra* at 23–25.

The evidence against Defendants is conclusive.  Nearly all of the evidence is in black-and-white and in the form of Defendants' admissions.  Nevertheless, Defendants continue to contest facts that are not subject to a genuine dispute and collectively assert, in 126 instances in their recently-filed answers to the Trustee's operative complaint, that they "lack[] sufficient knowledge" to admit an allegation. *See generally* Dkt. 169 ("**UHC Answer**"); Dkt. 170 ("**HP Answer**").  But even accepting Defendants' version of the facts, coupled with those facts that are not subject to a genuine dispute, the Court should grant partial summary judgment in favor of the Trustee.

The Trustee respectfully requests that the Court enter a partial judgment against Defendants under Count I of his first amended complaint (the "**FAC**"), *see* Dkt. 88 (under seal version); Dkt. 110 (public/redacted version), in an amount of at least $**11,570,866**, for Defendants' breaches of their ERISA fiduciary duties and the losses they caused to the NEMF Plan.  The Trustee also requests that the Court, in the judgment, disgorge all compensation Defendants received over the period from 2014 to 2020 while breaching their fiduciary duties, in an amount of not less than **$9,687,713**.  Finally, the Trustee seeks summary judgment—and punitive damages—under Count II of the FAC *if* the Court determines that any portion of the losses to the NEMF Plan cannot be established because Defendants concealed material evidence from the Trustee in discovery.

## II.   UNDISPUTED FACTS

### A.   IN 2008, DEFENDANTS AND NEMF ENTERED INTO THE ASA

New England Motor Freight, Inc. ("**NEMF**") and its subsidiaries offered "a broad range of transportation services" "with a focus in the Mid-Atlantic, Midwest and Northeast United States." *See In re New England Motor Freight, Inc.*, No. 19-12809 (Bankr. D.N.J. Feb. 11, 2019) (the "**Bankruptcy Case**"), Dkt. 22 at ¶ 8.  In 2008, Defendants entered into an *Administrative Services Agreement* with NEMF (the "**ASA**") in connection with the self-funded and ERISA-governed healthcare plan for NEMF's and its subsidiaries' employees and their dependents ("**NEMF Plan Participants**"). *See generally* Ex. T-1, ASA; Ex. T-2, 08/09/22 Eisenberg Depo. at 13:17–16:3. Craig Eisenberg, who was NEMF's Chief Financial Officer from 1998 through 2018 (the "**NEMF CFO**"), executed the ASA on behalf of NEMF. *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 13:17–13:21, 15:8–15:11, 26:18–27:7; Ex. T-1, ASA at UHC000003.

#### 1.   NEMF Served as the "Plan Administrator" of the NEMF Plan

NEMF served as the "plan sponsor" and "**Plan Administrator**" of the NEMF Plan and, in that capacity, was "responsible for the [NEMF] Plan's operation." Ex. T-1, ASA at UHC000005 (defining "Plan Administrator"); *see also, e.g.*, Dkt. 46 at ¶ 2 (the parties jointly acknowledging NEMF's roles).  The NEMF CFO "oversaw" NEMF's role as Plan Administrator. *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 20:12–20:19; Ex. T-3, 06/22/22 Serpico Depo. at 17:19–18:6 (UnitedHealthcare's relationship manager for the NEMF Plan, testifying that he "principally interact[ed]" with the NEMF CFO concerning the NEMF Plan).

#### 2.   Defendants Served as the "Claims Administrators" of the NEMF Plan

Both Defendants were expressly-named ERISA fiduciaries of the NEMF Plan. *See* Ex. T-1, ASA at § 4.2 ("You appoint Us a named, ERISA fiduciary under the [NEMF] Plan[.]");[1] *see also id.* at § 2.1 (Defendants "acknowledg[ing] that they shall be responsible to comply with … ERISA"); *id.* at § 13.1 (addressing "Our fiduciary obligations under ERISA").  Defendants

---

[1]     In the ASA, NEMF is defined as "You," whereas UnitedHealthcare and Harvard Pilgrim are "collectively" defined as "Our," "Us" or "We." *See* Ex. T-1, ASA at UHC000003.

performed "[c]laims [p]rocessing" services and "claim administration duties," *see id.* at §§ 2.1, 4.1, "as the claims administrators" of the NEMF Plan (the "**Claims Administrators**"). *See id.* at § 3.4; *see also* Dkt. 170, HP Answer at ¶ 2 (Harvard Pilgrim "admit[ting] that … it was a party to [the ASA]" … to provide … administrative services related to the processing and payment of claims submitted to [the NEMF Plan]"); Dkt. 169, UHC Answer at ¶ 2 (UnitedHealthcare admitting same).  NEMF, as the Plan Administrator, delegated these functions to Defendants because they held themselves out as "experts" and NEMF "did not have the staff" necessary to review, process and pay healthcare claims. *See* Ex. T-4, 08/08/22 Lomuti Depo. at 37:3–37:18.[2]

As the expressly-named fiduciaries and Claims Administrators of the NEMF Plan, both Defendants agreed, among other things, to: (i) "**perform**[] … **benefit determinations**," (ii) "**determine the validity of charges** submitted to … the [NEMF] Plan" by medical providers, (iii) "**make** … **determinations concerning the availability of** [**NEMF**] **Plan benefits**," and (iv) "**pay**[]" **healthcare claims**." *See* Ex. T-1, ASA at § 4.2 (emphasis added).  Defendants exercised "discretion and authority" or "discretionary authority" over each of the foregoing functions, *see id.* at §§ 4.1, 4.2, which connotes their roles as ERISA fiduciaries. *See infra* at 42 (discussing same).  To the extent any provision of the ASA "purports to relieve" Defendants from their fiduciary duties, those provisions violate ERISA and are "void as against public policy." *See infra* at 41 (discussing same).

## B.    DEFENDANTS' NETWORKS OF MEDICAL PROVIDERS

Defendants made "in-network" medical providers available to NEMF Plan Participants. Ex. T-1, ASA at UHC000005 (defining "Managed Care Network" and "Participant"). Specifically, Defendants established a "group of [n]etwork [p]roviders … who … entered into … contract[s] … under which they agree[d] to provide health care services to [NEMF Plan] Participants and accept negotiated fees for these services." *Id.* (defining "Managed Care

---

[2]    Matthew Lomuti worked in NEMF's finance department from 1988 through 2019 and was NEMF's Vice President of Finance from 2016 through 2019 (the "**NEMF Finance VP**"). *See* Ex. T-4, 08/08/22 Lomuti Depo. at 12:12–13:4.  When the NEMF CFO retired in December 2018, the NEMF Finance VP assumed that position for NEMF. *See id.* at 13:2–13:8, 21:2–21:5, 21:19–22:1.

Network"). "[NEMF Plan] Participants who reside[d] in … Massachusetts, New Hampshire and Maine [were] … treated as Harvard Pilgrim … participants and … receive[d] their in-network health care services from the network of physicians, facilities and other health care providers … that … contracted with [Harvard Pilgrim.]" *Id*. at § 4.3. NEMF Plan Participants who resided outside of Massachusetts, New Hampshire and Maine received their in-network health care services from medical providers that contracted with UnitedHealthcare. *Id*.

### C.   DEFENDANTS' SERVICES AS CLAIMS ADMINISTRATORS

Over the period from 2014 to 2020, "United[Healthcare] … provided services related to the processing and payment of healthcare claims for the NEMF [] Plan" and "made payments for [medical and pharmacy] benefits submitted to the NEMF [] Plan … that … exceeded $170 million." *See* Dkt. 169, UHC Answer at ¶¶ 3, 38; *see also* Ex. T-5, 06/28/22 Verga Depo. at 20:21–21:10 (UnitedHealthcare designee testifying that, as a Claims Administrator, UnitedHealthcare "process[ed] claims" and "evaluate[d] claims … to determine if a claim[ was] eligible" to be paid by "look[ing] at standard coding" submitted by medical providers); Ex. T-6 (in 2017, UnitedHealthcare conceding that it "acts as the [NEMF] Plan's ERISA claims fiduciary").

Harvard Pilgrim blames UnitedHealthcare for any breaches of fiduciary duties and contends that it "did not adjudicate a single claim for benefits at issue in this case," *see* Dkt. 149 at 12, but, instead, "priced" claims for the NEMF Plan submitted by medical providers in Harvard Pilgrim's network. *See* Dkt. 162, 11/30/22 Tr. at 46:3; Ex. T-7, 08/03/22 Rodrigues Depo. at 39:9–40:16 (Harvard Pilgrim designee stating same).[3] Notwithstanding Harvard Pilgrim's attempt to minimize its role for the NEMF Plan, UnitedHealthcare confirms that "**pricing a claim**" is "**part of the process**" of "**performing benefit determinations**" and "**determining the validity of charges**" submitted by medical providers. *See* Ex. T-8, 07/01/22 Shreiner Depo. at 39:3–39:6, 39:21–40:4 (emphasis added); *see also supra* at 4 (the ASA identifying these two aspects of

---

[3]    "Pricing" refers to the process by which a claims administrator "reviews" its contracts with medical providers and determines the "allowed amount" of a healthcare claim "according to [those] contracts." *See* Ex. T-7, 08/03/22 Rodrigues Depo. at 34:10–35:5, 53:4–54:10.

Defendants' duties as fiduciaries).  Likewise, **Harvard Pilgrim concedes that its participation in the NEMF Plan** "**was a partnership**" **with UnitedHealthcare**. Ex. T-7, 08/03/22 Rodrigues Depo. at 99:7–99:19 (emphasis added).  Despite Harvard Pilgrim's legally-inapposite efforts to disavow its representations in the ASA, *see infra* at 42 (discussing same), Harvard Pilgrim cannot identify any amendment to the ASA that removed Harvard Pilgrim as "a named, ERISA fiduciary." *See* Ex. T-7, 08/03/22 Rodrigues Depo. at 74:22–75:3.

### D.    HARVARD PILGRIM'S FAILURE TO MONITOR UNITEDHEALTHCARE

Even accepting Harvard Pilgrim's position that UnitedHealthcare *performed* most claims-administration duties for the NEMF Plan, Harvard Pilgrim cannot identify any instances in which it "access[ed] … records … to determine whether UnitedHealthcare [wa]s properly adjudicating claims," *see id*. at 85:19–86:1, or "intervened in UnitedHealthcare's claims processing to address and correct some problem." *Id*. at 86:16–87:1.  To the contrary, Harvard Pilgrim admits that it (i) never took steps to "monitor UnitedHealthcare's performance," *id*. at 86:2–86:10, (ii) never "review[ed] and evaluate[d] the propriety of UnitedHealthcare's claims administration," *id*. at 86:7–86:10, and (iii) never "independently evaluate[d] whether it agree[d] with UnitedHealthcare's adjudication of claims." *Id*. at 86:11–86:15.  As a result of these omissions, Harvard Pilgrim is jointly and severally liable as an ERISA "co-fiduciary" for its partner's (*i.e.*, UnitedHealthcare's) breaches of fiduciary duties. *See infra* at 42 (discussing same).

### E.    UNITEDHEALTHCARE'S PAYMENT ERRORS

The Trustee retained three expert witnesses who collectively identified *nine* categories of objectively-improper payment errors and determined the damages associated with each category (the "**Error Categories**").[4]  The nine Error Categories are comprised of UnitedHealthcare's

---

[4]    The Trustee also recently served supplemental expert reports to address additional categories of payment errors in a set of data Defendants produced in December 2022 (the "**Supplemental Error Categories**"). *See* Dkts. 160, 168.  The Trustee has identified $2.6 million of additional errors in the Supplemental Error Categories (notwithstanding missing records in the December 2022 production concerning another $2.1 million of claims).  Recognizing that Defendants are permitted to examine the Trustee's experts at trial on the Supplemental Error Categories, the Trustee is not moving for summary judgment on them. *See* Dkt. 160 at 1–2.

overpayments to medical providers (the "**Overpayments**") and payments that UnitedHealthcare made on healthcare claims without first obtaining necessary data from medical providers (the "**Missing Data Payments**").  The records Defendants produced in discovery reveal each of UnitedHealthcare's payment errors as a Claims Administrator.

Defendants retained one expert witness to specifically address the healthcare claims within the nine Error Categories: Biggs Cannon.  In September 2022, Defendants served Mr. Cannon's expert report on the Trustee, in which he presents certain theories to reduce the Error Category damages to $7.8 million, as follows:

| ERROR CATEGORY | ASSERTED DAMAGES | MR. CANNON'S OPINION RE: MAXIMUM DAMAGES |
|---|---|---|
| **OVERPAYMENTS** | | |
| Amount Paid > Amount Billed | $5,767,504 | $5,286,975 |
| Amount Paid > Amount Billed (Itemized) | $5,911,433 | $455,831 |
| Amount Paid > Amount Allowed under NEMF Plan | $1,402,208 | $137,808 |
| *Subtotal (Overpayments)* | **$13,081,145** | **$5,880,614** |
| **MISSING DATA PAYMENTS** | | |
| Missing Revenue Codes | $259,434 | $7,038 |
| Missing Count Codes | $673,953 | $18,342 |
| Missing Procedure Codes | $1,585,420 | $695,596 |
| Missing Billing NPI Number | $783,291 | $50,130 |
| Missing Rendering NPI Number | $9,284,343 | $58,754 |
| Missing Drug Codes | $3,486,887 | $1,094,589 |
| *Subtotal (Missing Data Payments)* | **$16,073,328** | **$1,924,449** |
| **TOTAL** | **$29,154,473** | **$7,805,063** |

*See* Ex. T-9, Cannon Report at 19, 22, 26, 30, 33, 36, 40, 44, 57 (Tables 1, 2, 3, 4, 5, 6, 7, 8, 14).

One of Mr. Cannon's theories, however, constitutes a plain violation of the Court's preclusion Orders in this case (collectively, the "**Preclusion Orders**").  *See* Dkts. 81, 83, 159. Defendants intend to elicit testimony from Mr. Cannon to supplant the records Defendants produced in discovery, which explicitly reveal erroneously-paid claims. *See* Ex. T-9, Cannon Report at ¶ 61.3.  Specifically, Mr. Cannon observes that, in the records Defendants produced to

the Trustee, certain of the healthcare claims in the Error Categories contain an "Override Code 13" indicator. *See id*. Mr. Cannon contends that the Override Code 13 indicator identifies a claim for which a UnitedHealthcare employee manually intervened in the adjudication-and-payment process and, therefore, "overr[o]de the normal automated adjudication process." *See id*.; *see also* Dkt. 46 at ECF p. 11 n.8 (Defendants asserting that "the vast majority of claims are adjudicated through automated processes"). Continuing, Mr. Cannon explains as follows:

> I removed [from the Trustee's calculated damages] all … claims … with an Override Code [13].… **Given that these claims were manually adjusted by qualified United[Healthcare] claims adjudicators trained to follow internal company policies, I believe it is appropriate to assume that these claims were properly adjusted** ….

*See* Ex. T-9, Cannon Report at ¶ 61.3 (emphasis added). Mr. Cannon "removed" a total of $3,765,803 of damages because Defendants assert that Mr. Cannon's opinions should **replace the information Defendants produced during fact discovery, which plainly reveal payment errors**. *See id*. at 26, 30, 36, 40 (Tables 3, 4, 6, 7). Mr. Cannon's theory is a further violation of the Preclusion Orders. *See, e.g.*, Dkt. 167, *Memorandum Order* at 5. Accordingly, in the absence of the "Override Code 13" theory, Defendants have no genuine dispute remaining for trial concerning at least **$11,570,866** of damages in the Error Categories.[5]

###### F.   UNITEDHEALTHCARE WAS AWARE OF ITS CLAIMS-PROCESSING ERRORS

At the outset of 2014, UnitedHealthcare "suspended claim processing," without notice to NEMF, to perform "updates" to its adjudication systems. *See generally* Ex. T-10. When the NEMF CFO suspected that UnitedHealthcare had not been processing claims during the first 49 days of the calendar year, he inquired with Robert Serpico of UnitedHealthcare (the "**UHC Account Executive**"). *See id*. at CLANCY00000318. The UHC Account Executive contacted his superior,

---

[5]   At trial, the Trustee will demonstrate why Mr. Cannon's other theories to reduce the Error Category damages to $11.5 million also are meritless. During the November 30, 2022 hearing before the Court, the Trustee explained that Defendants pay healthcare claims in the absence of required (but missing) information because "it favors their adjudication and payment of claims. They benefit from it." *See* Dkt. 162, 11/30/22 Tr. at 94:11–94:15. In fact, Defendants readily admit that UnitedHealthcare pays claims with missing data and uses "algorithms" to guess what the missing data would have revealed if UnitedHealthcare had obtained it. *See* Dkt. 149 at 33.

John Verga (the "**UHC Vice President**"). *See id.* at CLANCY00000317.  The following day, the UHC Account Executive acknowledged that "**there have been claim system issues** … **combined with a backlog**" of **unprocessed claims** and, therefore, UnitedHealthcare "suspended claim processing." *Id.* (emphasis added).  "I share your frustration and disappointment in discovering this….  Once we have more details on when this will be corrected … I will let you know.  [The UHC Vice President] and I have escalated this within the organization to **improve our processes.** This is unacceptable[.]" *Id.* (emphasis added).

At the time, NEMF and its insurance consultant—Robert Weinberg of UIC, Inc. (the "**NEMF Consultant**")—were planning to audit UnitedHealthcare's performance as a Claims Administrator. *See* Ex. T-11 (in May 2013, the NEMF Consultant e-mailing the NEMF CFO, with the subject line "[c]**laim problems again!**," and stating that **UnitedHealthcare** "**need**[s] **to receive an audit wakeup call**") (emphasis added); Ex. T-2, 08/09/22 Eisenberg Depo. at 72:9–72:21 (NEMF CFO testifying that "we were concerned" about whether UnitedHealthcare was "making the right determinations in [its] claims handling" and whether UnitedHealthcare was "fulfilling [its] role" as a "[Claims A]dministrator").

On September 17, 2014, the NEMF CFO sent an *Audit Notification Letter* to the UHC Account Executive to formally identify BMI Audit Services, LLC ("**BMI**") as NEMF's auditor. *See* Ex. T-12 at CLANCY00026623.  The UHC Account Executive requested "a formal audit scope document from BMI" for UnitedHealthcare's "approval." *See id.* at CLANCY00026622–23.  UnitedHealthcare approved the scope and parameters of the audit (the "**Audit**"), *see, e.g.*, Ex. T-1, ASA at § 9.3 ("The place, time, type, duration, and frequency of all must be … agreed to by Us."), which proceeded in two phases.  *First*, UnitedHealthcare produced a "claims data file" to BMI for healthcare claims UnitedHealthcare paid over the period from January 1, 2013 to September 30, 2014; based only on that data, UnitedHealthcare required BMI "to select [an] audit sample[]" of "200 claims." *See* Ex. T-13 at UHC026210–11.  *Second*, UnitedHealthcare permitted BMI to travel to one of its offices and review "on-site" a much more robust set of information—

but only for the 200 claims that BMI pre-selected in phase one. *See id*. at UHC026210, 13; *see also* Dkt. 169, UHC Answer at ¶ 75 (admitting that BMI was limited to "200 audit samples").

In January 2015, BMI issued its Audit report. *See* Ex. T-13.  On January 6, 2015, UnitedHealthcare internally circulated its preliminary response to the Audit, *see generally* Ex. T-14, and, on March 24, 2015, UnitedHealthcare issued its final response (the "**Final Response**"). *See generally* Ex. T-15.  Among the 200 sampled claims, BMI and UnitedHealthcare agreed that 98 were paid correctly and 39 were paid in error. *See* Dkt. 169, UHC Answer at ¶ 77. UnitedHealthcare disputed BMI's error findings as to all other sampled claims. *See id*.[6]  Thus, (i) BMI concluded that **UnitedHealthcare paid less than 50% of the sampled claims correctly** (*i.e.*, **98 of 200**), (ii) the parties agreed that **UnitedHealthcare <u>erroneously paid 19.5% of the claims</u>** (*i.e.*, **39 of 200**), and (iii) the parties disagreed about the propriety of the remaining claims United Healthcare paid.  UnitedHealthcare's internal records reveal that nearly all of the "agreed" errors were "<u>**overpayments**</u>" in which UnitedHealthcare either: <u>(i)</u> paid a claim with **an** "**incorrect CPT code**" **that it** "[s]**hould have denied**," *see* Ex. T-14 at UHC00084539 (sample number 7) (emphases added), or <u>(ii)</u> "[p]**aid non-covered services**." *See id*. (sample number 76–80) (emphasis added).

UnitedHealthcare conceded that the "agreed" errors were the product of both "manual" flaws and "system" defects. *See, e.g.*, Ex. T-14 at UHC00084539 (sample numbers 7, 33, 34, 35), UHC00084541 (sample numbers 3, 194).  For the "manual" flaws, UnitedHealthcare determined that "**refresher training [needed] to be provided to the responsible processor**." *Id*. at

---

[6]     Responding to UnitedHealthcare's refusal to accept more than 30% of BMI's findings, the UHC Account Executive observed "[t]here are many disagreed to claims" and "**I don't think I have ever seen this many**." *See* Ex. T-16 at UHC00084343 (emphasis added).  The NEMF CFO testified that "UnitedHealthcare … was doing everything in [its] power to … [minimize] a lot of the stuff" that BMI found in the Audit and we "wasted way too much time going back and forth[.]" *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 144:3–144:16.  "[I]t became very clear … that [UnitedHealthcare was] going to drag this out forever …. and … we lost patience with the whole thing." *Id*. at 144:18–145:5.

UHC00084539 (sample numbers 7, 33, 34, 35) (emphasis added).[7]  For the "system" defects, UnitedHealthcare planned to conduct "[**f**]**urther review** … **as to possible fix**." *Id.* at UHC00084541 (sample numbers 3, 194) (emphasis added).  A member of UnitedHealthcare's "Audit Team" sent an e-mail to more than 35 UnitedHealthcare employees:

> The remediation phase will begin immediately; therefore, your continued active assistance will be crucial in providing a prompt response to the audit firm once their report is received.  In an effort to be pro-active & prevent future errors, please initiate any necessary … discussions with your customer ….  Timely remediation is critical to demonstrate to the customer that UHC is committed to resolving this audit timely and demonstrating command and control over our processes.  A call will be scheduled to make introductions and determine the main contacts from your area to partner with the Remediation Analyst and Audit Response Team.

Ex. T-16 at UHC00084344 (emphasis removed).

In the Audit, BMI concluded that "[**o**]**nce the issues** … **are resolved**" that caused the payment errors, "it is likely that [UnitedHealthcare] would be performing in a satisfactory manner in terms of benefit payment and processing accuracy, and within industry standards." *See* Ex. T-13 at UHC026222 (emphasis added).  Following the Audit, however, UnitedHealthcare's claims-processing errors continued.

In June 2015, two months after UnitedHealthcare issued its Final Response to the Audit, the UHC Account Executive e-mailed several colleagues, including the UHC Vice President, to address "**Claim Processing**." *See* Ex. T-17 at UHC00068959 (emphasis added).  He wrote as follows:

> **My cases seem to be exploding with issues and we** … **cannot seem to get them resolved** either timely or correctly.  Customers are getting frustrated and questioning our quality.  **I have not seen it this bad in all my years here**.  **I don't have the time to list all the examples** but most of you have seen them over the past few months….  We are drowning in service issues and continuous follow up.  **Is anyone looking at this??**

---

[7] Despite UnitedHealthcare's record of admitted "manual" (a/k/a human) errors, Defendants intend to elicit testimony from Mr. Cannon that "it is appropriate to ***assume*** that … claims were properly" paid if they "were manually adjusted" because UnitedHealthcare uses "qualified claims adjudicators trained to follow internal company policies." *See supra* at 8 (emphasis added).

*Id.* at UHC00068960 (emphasis added) (alteration to form).  Also in June 2015, the UHC Account Executive separately alerted the UHC Vice President that NEMF "**has no confidence in our claims processing system and is ready to move**[.]" *See* Ex. T-18 (emphasis added).

Defendants' claims-processing errors continued in 2016. *See, e.g.*, Ex. T-19 at CLANCY00048929 (on January 6, 2016, the NEMF CFO stating that "[v]irtually any out of network claim that is sent in becomes an issue" and "[e]ven when I get [a UnitedHealthcare employee] involved **it still takes weeks** … **to get things processed properly**") (emphasis added); *id.* (NEMF CFO reflecting that "[e]ach year [NEMF] completes a survey and rates [UnitedHealthcare] very low yet the **processing of claims does not improve**") (emphasis added).

In April 2016, UnitedHealthcare was forced to assemble a team of personnel—including Paul Marden, the CEO of UnitedHealthcare's New Jersey office (the "**UHC CEO**")—to meet with NEMF representatives about ongoing failures in Defendants' administration of claims. *See* Ex. T-20 (on May 5, 2015, the UHC Account Executive addressing the "meet[ing] last week with … our CEO … to review the **various issues** you have experienced over the past few years" and "to make **process improvements**") (emphasis added); Dkt. 169, UHC Answer at ¶ 96.

In May 2016, following the meeting, the UHC CEO instructed the UHC Vice President and the UHC Account Executive to create an *NEMF UnitedHealthcare Issue Log* (the "**Issues Log**") to track the various claims-administration errors that were impacting the NEMF Plan. *See* Dkt. 169, UHC Answer at ¶ 96 ("United[Healthcare] admits it established an 'issue log' to track … a variety of concerns raised by NEMF with regard to [the] NEMF [] Plan"); Ex. T-21 at UHC00097505–08 (Issues Log); Ex. T-3, 06/22/22 Serpico Depo. at 103:15–103:20.  The UHC Account Executive testified that this was the first instance in his 13 years at UnitedHealthcare in which he created an "issue log" for a client. *See* Ex. T-3, 06/22/22 Serpico Depo. at 103:4–103:14.

The Issues Log describes "**claim errors**," "[**c**]**onstant problems with errors in processing**," "[**d**]**uplicate claims payments**" and "**oversights by UHC staff**." *See* Ex. T-21, Issues Log at UHC00097505, 06 (emphasis added).  Before UnitedHealthcare delivered the Issues Log to NEMF, the UHC CEO instructed his team that "[o]**ur challenge is to try and eliminate**

the issues" because "[w]e have had way too many, and we need to come up with a plan that" "**improve[s] … claim processing**[.]" *Id.* at UHC00097503 (emphasis added); *see also* Ex. T-5, 06/28/22 Verga Depo. at 49:2–50:1 (UHC Vice President testifying that **UnitedHealthcare** "**err[ed] in handling** … **claims**" and encountered "**problems associated with** … **claims getting processed**") (emphasis added); Ex. T-22 (in May 2016, the UHC Account Executive reporting internally that the **NEMF Plan** "**ha[s] had <u>countless claim processing issues</u>**") (emphases added).

Claims processing errors continued thereafter, through 2017 and 2018. *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 29:12–30:8 (NEMF CFO testifying that, by 2018, NEMF "lost a lot of trust … in [UnitedHealthcare's] handling of claims"); Ex. T-4, 08/08/22 Lomuti Depo. at 39:9–40:2 (NEMF Finance VP testifying about NEMF's "dissatisfaction with United[Healthcare]" "in 2018" and "**regular concerns**" about "[p]**ayment of claims**" and "**claims administration**") (emphasis added); Ex. T-23 (in February 2018, the NEMF Consultant e-mailing the UHC Account Executive to address UnitedHealthcare's failures in the "**processing of large claims**").

## G. UNITEDHEALTHCARE REJECTED EACH OF NEMF'S ATTEMPTS TO INTERVENE

"NEMF was very hands on" and "met regularly with UnitedHealthcare" to "discuss[] any questions or concerns with the administration" of the NEMF Plan. *See* Ex. T-24, 08/10/22 Weinberg Depo. at 20:1–20:4. Despite NEMF's attempts to intervene and protect the NEMF Plan, UnitedHealthcare consistently rejected NEMF's proposals for the stated reasons of seeking to (i) protect its favored relationships with third parties in the industry, and/or (ii) protect the revenue it generated from the NEMF Plan.

In April 2014, NEMF "wanted to bring in BMI to do … hospital audits and not have UHC audit their own payment of hospital bills." *See* Ex. T-25 at CLANCY00028103.[8] In the healthcare insurance industry, hospital or "facility" claims typically are the most expensive claims that a claims administrator will adjudicate. *See* Ex. T-26 at ¶ 10. NEMF inquired with the UHC Account

---

[8] Hospital audits seek to determine the propriety of medical providers' submissions of claims and, therefore, have a different focus than the contractual audits that NEMF attempted to perform concerning the propriety of UnitedHealthcare's performance as a Claims Administrator.

Executive and asked "[w]hy aren't we receiving any reports on [hospital audits]?" *See* Ex. T-25 at CLANCY00028105.  The UHC Account Executive responded that he would "see if we have reporting on these hospital audits." *Id*. at CLANCY00028104.  Several days later, the UHC Account Executive confirmed that "there is no reporting[.]" *Id*. at CLANCY00028103.  Given the lack of reporting, the NEMF Consultant wrote the UHC Account Executive:

> As previously discussed we have identified an auditing firm that would conduct Hospital claims audits on behalf of NEMF.  We fully anticipate that NEMF would achieve more significant results if allowed to utilize their vendor of choice for hospital audits.  Will UHC provide BMI [] the detailed hospital billing required to conduct an audit of that billing?

Ex. T-27 at WEINBERG00046863.

The UHC Account Executive contacted UnitedHealthcare's "audit team" and later responded that UnitedHealthcare "could not allow [BMI] to provide these services **without violating [its] contracts with our existing vendors**" **who** "**perform these services**." *Id*. at WEINBERG00046862–63 (emphasis added).  Thus, UnitedHealthcare would maintain a veil of secrecy over the propriety of its payments to hospitals, which represented <u>65%</u> of UnitedHealthcare's medical-claims spend from the NEMF Plan's assets. *See* Ex. T-26 at ¶ 18.a.

In June 2015, NEMF and BMI sought to determine "why" UnitedHealthcare did "not provide[]" certain data during the Audit that would reveal instances of medical providers submitting fraudulent claims. *See* Ex. T-28 at UHC00046081 (addressing "[u]nbundling" data).  To limit the NEMF Plan's exposure to fraudulent and abusive claims submitted by medical providers, BMI "recommend[ed]" that UnitedHealthcare require medical providers to include additional information "upfront" when submitting a claim for payment. *See id*. at UHC00046074.  **UnitedHealthcare rejected the proposal because it** "**may adversely affect UHC's contractual relationships**" **with medical providers**. *Id*. (emphasis added).  UnitedHealthcare also refused to use its own resources to address NEMF's and BMI's concerns, stating that a "manual … review" of suspected fraudulent claims "is not something UHC would or could accommodate." *Id*.

14

The NEMF Consultant summarized UnitedHealthcare's outright disloyalty to the NEMF

Plan, writing to the UHC Vice President and the UHC Account Executive as follows:

> **The fact that there is even a concern that UHC has to protect [its medical] provider relationships is an issue**.  **UHC has entered into contracts with [plan administrators] and UHC should have an equal or greater concern for potential fraudulent or irregular billing practices against their clients[, like NEMF]**.  I would like to reiterate that it has become a well known fact that huge abuse continues ….

*Id.* at UHC00046073 (emphasis added).  Proving the NEMF Consultant's point, UnitedHealthcare

forced NEMF to accept a dearth of reporting about fraudulent claims and, instead, rely on

UnitedHealthcare's "Fraud, Waste and Abuse program," *see id.* at UHC00046072, which

UnitedHealthcare implemented to enhance its revenue. *See infra* at 28 (discussing same).

By 2017, UnitedHealthcare made clear to NEMF that its loyalties laid with other parties in

the industry with which it enjoyed long-term pecuniary relationships—*e.g.*, vendors and in-

network medical providers. *See, e.g.*, Ex. T-24, 08/10/22 Weinberg Depo. at 173:2–173:11 (NEMF

Consultant testifying that "**the system itself has built-in conflicts of interest because of the fact

that you're going to [the claims] administrator and trying to resolve something with a

[medical] provider and … the [claims] administrator doesn't want to upset that provider**"

given "**that those provider contracts are [the claims administrator's] most important asset**")

(emphasis added).  Accordingly, in January 2017, NEMF requested UnitedHealthcare's approval

to retain an auditor to examine invoices from out-of-network (or "non-participating") providers:

> It is understood that UHC has contracts with [its] participating hospital providers [*i.e.*, in-network medical providers] which define and limit the frequency and scope of independent claims audits which NEMF may perform.  However we are asking whether it would be possible to apply a step, prior to the payment of claims, to a nonparticipating facility.  As a non-par[ticipating] provider there would be no contract between UHC and that provider….  As such we would like to bring in an independent auditor such as Advanced Medical Pricing Solutions (AMPS).  AMPS could require that the facility provide an itemized billing statement that could be more thoroughly audited ….  Please advise as to whether this procedure can be put in place.

Ex. T-29 at UHC00053351.  UnitedHealthcare rejected NEMF's proposal because, among other

things, "UHC is already obtaining discounts from these facilities via our Shared Savings Program

[and] … Facility R&C" program. *See id*. at UHC00053350.  Here too, UnitedHealthcare used these two programs to generate fees and enrich itself. *See infra* at 28–30 (discussing same).

### H.   UNITEDHEALTHCARE'S REFUSAL TO PRODUCE REQUESTED INFORMATION

In November 2013, the NEMF CFO wrote to the UHC Account Executive to express his displeasure with UnitedHealthcare's inability to provide NEMF Plan information and stated that "we need to get past the honor system" and receive "more detailed" information. *See* Ex. T-30 at UHC00055684.  Five years later, in November 2018—and more than a decade after Defendants assumed their roles and duties as fiduciaries of the NEMF Plan—**the UHC Account Executive and other employees of UnitedHealthcare** (and its affiliate, Optum) **openly admitted among themselves that** *NEMF* "*think[s] we are hiding something, which in many cases we have and are*." *See* Ex. T-31 (emphases added).

Throughout UnitedHealthcare's tenure as a fiduciary of the NEMF Plan, it routinely withheld requested information from NEMF to avoid scrutiny about its misadministration of healthcare claims. *See, e.g.*, Ex. T-32 at WEINBERG00016807 (in June 2012, the UHC Account Executive stating that **UnitedHealthcare will not produce** "**reports**" **to NEMF that identify** "**overpayment[s]**" **caused by UnitedHealthcare's** "**claim processor errors**") (emphasis added); Ex. T-33 at CLANCY00051785 (in December 2014, NEMF discussing that "[**UnitedHealthcare**] **still refuse[s] to share the real gross numbers**," which "makes it perfectly clear [it has] a lot to hide") (emphasis added); Ex. T-25 at CLANCY00028103 (in April 2014, the UHC Account Executive confirming that "**there is no reporting of** [**hospital**] **audits**"); Ex. T-30 at UHC00055682 (in January 2015, the UHC Account Executive writing that "**our Data Governance folks are pushing back**" **on NEMF's information requests**) (emphasis added); Ex. T-34 (in June 2015, the NEMF CFO observing that, "after 2 years," **UnitedHealthcare** "**ha[s]n't gotten** [**its**] **act together**" **on** "**report[ing]**" and rhetorically stating that UnitedHealthcare "wonders why [NEMF] want[s] to do audits and why **we are so skeptical regarding the information we receive**") (emphasis added); Ex. T-5, 06/28/22 Verga Depo. at 44:8–44:22 (UHC Vice President testifying that, in April 2016, **UnitedHealthcare did not provide** "**reports**" **that**

NEMF requested to "**monitor high-cost claimants**") (emphasis added); Ex. T-20 (UHC Account Executive writing that **NEMF's requests for information** "**may be … challenging**" **to provide**); Ex. T-35 at CLANCY00013249, 51 (in July/August 2017, **UnitedHealthcare placing limitations on productions of** "**NEMF's claims data**" **and thereby** "**interfering with the operation of** [**the**] **NEMF**[ **Plan**]**'s benefits program**") (emphasis added); Ex. T-36 at UHC00065692 (in November 2017, the UHC Account Executive discussing **UnitedHealthcare** "[**d**]**ragging** [**its**] **feet on the pharmacy data**" **NEMF requested**) (emphasis added); Ex. T-3, 06/22/22 Serpico Depo. at 35:2–35:8 (UHC Account Executive testifying that he "**can't recall**" **any instance in which UnitedHealthcare produced** "**overpayment statistics**") (emphasis added); Ex. T-37 at UHC00044787 (in 2019, refusing to supply requested information to NEMF because **UnitedHealthcare** "**do**[**es**] **not provide a full reveal file**" **to plan administrators**).

## I.   UNITEDHEALTHCARE'S INSTITUTIONAL POLICY OF NON-DISCLOSURE

In addition to UnitedHealthcare's refusal to provide *requested* information to NEMF, Defendants took steps to prevent NEMF from pursuing audits—and then concealed material information from NEMF when it performed, or attempted to perform, an audit.

### 1.   UnitedHealthcare's Payment-Error Façade

To dissuade NEMF from performing any audits, UnitedHealthcare delivered annual self-reviews to NEMF in which it *misrepresented* its performance as a Claims Administrator (the "**Performance Results**"). *See* Ex. T-38 (Performance Results for 2008–2009, 2011–2018). Each year, UnitedHealthcare touted a near-perfect "dollar accuracy" rate in its payment of healthcare claims, which Defendants define as "the percentage of claims dollars processed accurately":

|  | "DOLLAR ACCURACY" RATE DEFENDANTS REPORTED TO NEMF | "DOLLAR ACCURACY" ERROR RATE DEFENDANTS REPORTED TO NEMF |
|---|---|---|
| 2008 | 99.86% | **00.14%** |
| 2009 | 99.86% | **00.14%** |
| 2011 | 99.91% | **00.09%** |
| 2012 | 99.90% | **00.10%** |
| 2013 | 99.00% | **1.000%** |
| 2014 | 99.90% | **00.10%** |
| 2015 | 99.90% | **00.10%** |

17

| 2016 | 99.00% | **1.000%** |
| 2017 | 99.00% | **1.000%** |
| 2018 | 99.90% | **00.10%** |

*See id.*; *see also* Dkt. 169, UHC Answer at ¶ 60 ("United[Healthcare] admits that its annual Performance [] Results from 2014 to 2020 reflect 'near perfect accuracy,' but states that the Performance [] Results speak for themselves").[9]

UnitedHealthcare delivered these false Performance Results to NEMF to mask the truth about its misadministration of healthcare claims. *See supra* at 8–13 (discussing UnitedHealthcare's *actual* history of "processing errors"); *see supra* at 10 (discussing UnitedHealthcare's "agreed" **19.5%** error rate in the Audit from "overpayments"); *see supra* at 10, 10 n.6 (discussing UnitedHealthcare's refusal to accept that it improperly paid another 30% of the healthcare claims in the Audit ); *see supra* at 6–7 (discussing undisputed evidence of $11,570,866 of improperly-paid claims over the period from 2014 to 2020, representing an error rate of approximately **8.5%** of the total medical claims Defendants paid over that period).[10]

For the same malign reason, UnitedHealthcare withheld supporting information and documents from its annual Performance Results. *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 87:3–87:6 (NEMF CFO testifying that the underlying "documentation[] to prove … their percentage[s] … was totally lacking"); *id.* at 87:6–87:7, 87:18–87:19 (NEMF CFO testifying that "there was no substance to" the Performance Results, which were conducted "o[n] the honor system"); Ex. T-24, 08/10/22 Weinberg Depo. at 93:13–93:14, 155:12, 155:17–155:18 (NEMF Consultant testifying that NEMF had to "rely[]" on Defendants "to be truthful" "because they're reporting on [themselves]" and "you're hoping that they're going to give you an accurate report"); Ex. T-3, 06/22/22 Serpico Depo. at 114:19–114:20 (UHC Account Executive testifying that he "never asked [for] or received any kind of backup reporting" for the Performance Results).

---

[9]     Prior to 2015, UnitedHealthcare described "dollar accuracy" as "financial accuracy." *See generally See* Ex. T-38.  Both accuracy rates measure percentage errors on funds administered; whereas "dollar accuracy" focuses on "paid dollars," "financial accuracy" focuses on "billed dollars." *See* Ex. T-39, 07/01/22 Beirne Depo. at 22:12–23:8.

[10]     *See* Ex. T-26 at ¶ 17 (identifying $135,911,380 of medical claims paid from 2014 to 2020).

UnitedHealthcare has offered an explanation for the discrepancy between the low error rates listed in the Performance Results and UnitedHealthcare's *actual performance* as a Claims Administrator on the NEMF Plan: if the Performance Results do not demonstrate near-perfect accuracy rates, "**we'd be out -- not out of business, but we would not have the customer base we have**." Ex. T-39, 07/01/22 Beirne Depo. at 32:6–32:8 (emphasis added).  The UHC Account Executive, who delivered the Performance Results to NEMF each year, testified that he could not "recall" "any instance" in which UnitedHealthcare reported less than a 99.00% "dollar accuracy" rate to NEMF—or any of his *dozens* of other self-funded customers during his 17 years at UnitedHealthcare. Ex. T-3, 06/22/22 Serpico Depo. at 13:8–14:8, 106:9–107:5, 111:21–112:21. One of UnitedHealthcare's designees also testified that a "95 percent" accuracy rate "is a very low accuracy rate." Ex. T-39, 07/01/22 Beirne Depo. at 31:22–32:9.  Yet, all of the evidence in this case—including the Audit itself—demonstrates that UnitedHealthcare's accuracy rate under the NEMF Plan was even lower than 95 percent; indeed, Defendants' insistence that they made no more than $7.8 million of payment errors, *see supra* at 7, constitutes a 94.25% accuracy rate on the medical claims UnitedHealthcare paid between 2014 and 2020 *See supra* at 18 n.10.[11]

### 2.    UnitedHealthcare's Refusal to Accept Audit-Proposal Requests

If a plan administrator, like NEMF, refuses to blindly accept the Performance Results, UnitedHealthcare will hide behind contract language and refuse to accept an audit proposal. *See* Ex. T-1, ASA at § 9.3 ("The place, time, type, duration, and frequency of all audits must be … agreed to by Us.").  In fact, prior to the Audit that BMI performed in 2014 and 2015, NEMF approached UnitedHealthcare "with a few different requests for auditors, all of which were denied"

---

[11]    Defendants refused to produce in discovery any information about their accuracy rates in paying healthcare claims, contending that the information was "unnecessary to proving the claims at issue in this case." *See, e.g.*, Dkt. 46-2 at ECF p. 36 (Response No. 18).  Likewise, Defendants' designees and witnesses were unprepared at their depositions to answer any questions about UnitedHealthcare's historical accuracy rates. *See, e.g.*, Ex. T-5, 06/28/22 Verga Depo. at 60:5–60:13 (UHC Vice President testifying, "I just really can't answer that question"); Ex. T-3, 06/22/22 Serpico Depo. at 112:6–112:12 (UHC Account Executive testifying, "I can't recall"); Ex. T-39, 07/01/22 Beirne Depo. at 31:9–31:16 (UnitedHealthcare designee identifying the Performance Results as the only "statistics" that "UnitedHealthcare keep[s] … on its [accuracy] rates").

and, therefore, NEMF "argued" with UnitedHealthcare about audit proposals "for a few years" prior to the Audit. *See* Ex. T-2, 08/09/22 Eisenberg Depo. at 73:11–74:1.

### 3.   UnitedHealthcare's Concealment of Material Information

Although the purpose of an audit "is to identify errors in the administration process," *see* Ex. T-24, 08/10/22 Weinberg Depo. at 81:16–81:17, if UnitedHealthcare allows an audit to proceed, it withholds material information from the plan administrator and its auditor. UnitedHealthcare, through its ████████████████ withholds information about self-funded healthcare plans in furtherance of its institutional policy of "**supply**[**ing**] **minimum necessary data**." *See* Ex. T-40, 06/27/22 Brown Depo. at 48:9–48:19, 49:2–49:3 (emphasis added).

UnitedHealthcare requires plan administrators to conduct audits in two phases. *See, e.g.*, Dkt. 61-2 at ¶ 3; *see supra* at 9–10 (discussing BMI's two-phase Audit).   In phase one, UnitedHealthcare produces information to a plan administrator's auditor; based only on that information, UnitedHealthcare requires the auditor to select a "sample" of healthcare claims that will be the exclusive subject of the audit. *See* Dkt. 61-2 at ¶ 3.   In phase two, UnitedHealthcare requires the auditor to travel to its office to gain access to a more robust set of information—but only for the "sample" of healthcare claims that the auditor selected in advance. *See id.*

### a   UnitedHealthcare Withholds Material Information from Plan Administrators During the Sample-Selection Phase of an Audit

UnitedHealthcare has access to <u>*all*</u> of the NEMF Plan data and information that would reveal whether it properly processed claims for the NEMF Plan; that data and information exists in UnitedHealthcare's "claims adjudication systems and data storage and reporting systems." *See* Dkt. 149, at ECF p. 48; *see also* Dkt. 61-2 at ¶ 20 (UnitedHealthcare admitting that the "information[,] which can materially influence the amount a plan pays on any given claim[,] would be contained in individual claim files stored across multiple United[Healthcare] systems").   Those data and information systems include: (1) the "**TOPS/UNET System**," (2) the "**Galaxy Data Warehouse**" and (3) the "**CDD Datamart**":



*See* Dkt. 149, at ECF p. 48.

**The TOPS/UNET System**, "where a claim is processed and benefits are either paid or denied," **contains** "**the data necessary to determine whether a claim has been properly paid**." *See* Dkt. 61-2 at ¶ 6 (emphasis added); *see also* Ex. T-39, 07/01/22 Beirne Depo. at 39:7–39:13 (UnitedHealthcare designee testifying that "**if one wanted to determine whether a claim has been properly paid**, **one would need to access information from UNET**") (emphasis added). "Once claims are paid, [UnitedHealthcare] ships all of the data to … the Galaxy Data Warehouse." *See* Dkt. 162, 11/30/22 Tr. at 68:14–68:15. Thus, the Galaxy Data Warehouse contains "[c]laims data from the TOPS/UNET [System]," *see* Dkt. 149, at ECF p. 48, including CPT and HCPCS codes and other data that contain critical information about high-priced "outpatient facility" claims that UnitedHealthcare administers. *See* 61-2 at ¶ 12; *see also* Ex. T-41 (Defendants' counsel confirming that "CPT/HCPCS" codes were produced from "the Galaxy database") (second bullet); Ex. T-42 (Defendants' counsel confirming that their December 22, 2022 production of outpatient facility claims data sourced from "Galaxy as a data warehouse"); Ex. T-26 at ¶¶ 10, 17, 18 (addressing facility claims).

**UnitedHealthcare does <u>not</u> produce information from the TOPS/UNET System to plan administrators or their auditors to select an audit sample**. *See, e.g.*, Ex. T-37 at UHC00044787 ("Audit Team" member writing to the UHC Account Executive that "UHC will allow access to the UNET systems … while onsite"). Likewise, for the Galaxy Data Warehouse that contains information about UnitedHealthcare's payments on expensive facility claims, UnitedHealthcare does <u>not</u> maintain "standard prewritten reports to export that data out for

21

customers," like NEMF. *See* Dkt. 162, 11/30/22 Tr. at 68:14–68:17.  Accordingly, and by design, UnitedHealthcare does not produce material information—from either the TOPS/UNET System or the Galaxy Data Warehouse—for the purpose of selecting a "sample" of claims in an audit.

Instead, to select an audit sample, **UnitedHealthcare only produces information from the CDD Datamart using a so-called** "**standard data extract**." *Id*. at 68:16–68:20; *see also id.* at 69:15–69:20 (Defendants' counsel confirming that "in the BMI audit … [UnitedHealthcare] gave [NEMF and BMI] the basic standard data extract …. TOPS/UNET can't do that.  Galaxy doesn't do that; it's not built for that purpose.  That's what the CDD Datamart does.").  By design, **the CDD Datamart <u>excludes</u>** "**the data necessary to determine whether a claim has been properly paid**" **and only contains** "**a subset of claims data**" **that** "**does not attempt to capture data on each and every aspect of a claim.**" *See* Dkt. 61-2 at ¶¶ 6, 7 (emphasis added); *see also* Ex. T-39, 07/01/22 Beirne Depo. at 41:22–42:3 (UnitedHealthcare designee testifying that "[**y**]**ou need more than what's in the CDD Datamart if you're going to look at a claim to determine whether or not that claim was processed correctly**") (emphasis added).

UnitedHealthcare anchors its strategy of concealment around this data-collection system. Without any disclosure or notice, UnitedHealthcare placed all of the "necessary" information about the NEMF Plan (including CPT and HCPCS codes for expensive outpatient facility claims) outside of the reach of NEMF and BMI—and limited BMI's access to this information to only 200 claims that it was required to select from a "basic … data extract" drawn from the CDD Datamart.  Then, to further impede BMI's ability to select a claims sample, UnitedHealthcare included *manipulated* data in those extracts, which admittedly are "**United-created**" **data** that it describes as "**homegrown codes.**" *See* Dkt. 61-2 at ¶ 8 (emphasis added).  "In many cases where a United-derived code is used … it is because" UnitedHealthcare determined for itself that "a CPT or HCPCS code was irrelevant …." *Id.*; *see also, e.g.*, Ex. T-43 at ¶ 141 (Trustee's expert explaining that, "[i]n addition to missing critical healthcare claim data, … homegrown data values were provided [by UnitedHealthcare], which … impedes an independent and objective external assessment" of UnitedHealthcare's performance).

For the Audit, the NEMF Consultant testified that BMI's "goal [wa]s to get a **complete data download <u>and then choose</u>** … **the type of claims to be sampled**." Ex. T-24, 08/10/22 Weinberg Depo. at 103:20–103:22 (emphases added).  He also testified that a "full data download" would include, among other things, (i) "the billed amount" of a healthcare claim and (ii) "CPT codes that applied, you know, procedure codes" for outpatient facility claims. *See id*. at 148:18– 149:8.  But UnitedHealthcare does not store this information in the CDD Datamart and did not produce it to BMI. *See, e.g.*, Dkt. 61-2 at ¶ 12 (UnitedHealthcare declarant affirming that "the standard data extract" from the CDD Datamart "does not attempt to capture" "billed … information," which exists only in "Galaxy"); *see also* Ex. T-41 (Defendants' counsel confirming that "CPT/HCPCS" codes for outpatient facility claims were produced from the "Galaxy" database) (second bullet).

To camouflage its deception, UnitedHealthcare will freely produce "standard data extracts" containing the limited information in the CDD Datamart—and then promote those productions as something meaningful. *See, e.g.*, Dkt. 162, 11/30/22 Tr. at 69:15–69:18 (Defendants representing that, "in the BMI audit," UnitedHealthcare produced a "standard data extract that cover[ed] **every claim**") (emphasis added); Dkt. 149 at 15 (Defendants representing that "BMI was able to get … **100 percent of the records**" during the sample-selection phase of the Audit) (emphasis added); *see also infra* at 34 (discussing Defendants' misrepresentations to the Trustee that the "standard data extract" "contains much of the information sought by [the] Trustee" in discovery).

### b. UnitedHealthcare Deliberately "Suppresses" Available Information During the Sample-Selection Phase of an Audit

In addition to limiting productions to the "subset" of information in the CDD Datamart, *see supra* at 22, and in addition to manipulating that data with "United-created" homegrown codes, *see supra* at 22, UnitedHealthcare also hid and concealed readily-available information in the extracts it produced to NEMF and BMI.  To hide data, UnitedHealthcare deliberately "suppresses" it from a data extract.  UnitedHealthcare suppresses data in one of two ways; it either hides it completely from the data extract or it does not populate the data field that would contain the data

if it had not been suppressed. *See* Ex. T-40, 06/27/22 Brown Depo. at 30:6–30:13 ("When we suppress data fields in some cases **we suppress it completely**, which means you don't see that data element on the extract.  In other cases you'll see the data element … in the extract but **it will not be populated**.") (emphases added); *id*. at 30:22–31:5 (confirming that UnitedHealthcare suppresses data from its extracts by "**remov[ing] the field entirely** or … **remov[ing] the data from the field**") (emphasis added).

In October 2019, NEMF attempted to perform a second audit of UnitedHealthcare's performance as a Claims Administrator.  The NEMF Finance VP notified UnitedHealthcare about NEMF's intent, and the UHC Account Executive responded that he would "get[] confirmation on the audit …." *See* Ex. T-37 at UHC00044792.  UnitedHealthcare sent NEMF a "standard data" extract containing only the information that UnitedHealthcare was willing to produce from the CDD Datamart. *See id*. at UHC00044789.  NEMF reviewed the file and contacted the UHC Account Executive, stating that "**provider information and line item details** … **of how [a] claim was paid are not included in the standard data file**." *Id*. (emphasis added).  Among the missing information was "allowance[]" data, *see id*., which reveals the amounts UnitedHealthcare agreed to pay in-network medical providers for particular services.[12]  NEMF requested all such missing information. *See* Ex. T-37 at UHC00044788.

The UHC Account Executive relayed NEMF's request internally to UnitedHealthcare's "Audit Team." *See id*.  A member of the Audit Team responded that, notwithstanding the Plan Administrator's request for information about the NEMF Plan, "**We do not provide a full reveal file**." *Id*. at UHC00044787 (emphasis added).  In discovery, however, UnitedHealthcare confirmed that it *could have produced* the information that NEMF requested for the purpose of selecting an

---

[12]    "Allowances" (or "contracted rates") refer to the amounts Defendants have contractually agreed to pay a medical provider for particular treatments and services. *See, e.g.*, Ex. T-8, 07/01/22 Shreiner Depo. at 33:22–34:4 (UnitedHealthcare designee testifying that an "allowed amount" is "[t]he contracted amount that the provider has with … Harvard Pilgrim," for example). **UnitedHealthcare hides this information from plan administrators**, **like NEMF**, "**to protect [its] provider contracts**" and "**keep contracted rates confidential**." *See* Ex. T-40, 06/27/22 Brown Depo. at 49:4–49:7 (emphasis added); *see also infra* at 56 (discussing same).

audit sample. *See* Ex. T-40, 06/27/22 Brown Depo. at 40:18–41:12 ("[**C**]**ould we technically supply those additional fields** [**NEMF requested**], **yes**, … **but it's not traditionally done**.") (emphasis added).  UnitedHealthcare refused to produce the information, *see* Ex. T-3, 06/22/22 Serpico Depo. at 121:4–121:14, and, as a result, NEMF did not proceed with the audit. *See* Ex. T-4, 08/08/22 Lomuti Depo. at 81:12–82:2 (NEMF Finance VP testifying that when he requested information for the audit, the UHC Account Executive "seemed … not cooperative").

During the first Audit in 2014, neither NEMF, BMI nor the Insurance Consultant were aware that UnitedHealthcare "do[es] not provide a full reveal file."  The NEMF Consultant testified that if he had known UnitedHealthcare "was suppressing data," there "would have [been] an explosion of emails from NEMF objecting to the process[.]" *See* Ex. T-24, 08/10/22 Weinberg Depo. at 150:10–150:17.  Continuing, he stated as follows:

> I was not aware of any kind of suppression of data.  And had I been aware of a suppression of data, I would have objected to [UnitedHealthcare] not cooperating.  And I'm certain … that BMI as an auditor -- if they were told they couldn't have the data that they wanted, that would be part of their report.

*Id*. at 151:8–151:16.  But UnitedHealthcare deceived BMI, which believed that it received a "**complete data download**" from which it "**then … cho**[**se**] … **the type of claims to be sampled**." *Id*. at 103:20–103:22 (emphases added).

### c.    UnitedHealthcare Requires Plan Administrators to Select a Sample Based on Incomplete and Manipulated Information

The NEMF CFO testified that when NEMF decided to conduct the Audit in 2015, he personally "thought [the Audit] was going to be a complete waste of time because of **the restrictions** [**UnitedHealthcare was**] **placing upon** [**BMI**] **as to the sample size**[.]" Ex. T-2, 08/09/22 Eisenberg Depo. at 74:4–74:7 (emphasis added); *see also* Dkt. 169, UHC Answer at ¶ 75 (admitting that BMI only sampled 200 claims); Ex. T-2, 08/09/22 Eisenberg Depo. at 79:7–79:11 (testifying that "[BMI's] hands were tied as to what they were permitted to get as a sample, a population" of the data).

UnitedHealthcare restricted NEMF's "sample" for the Audit to 200 claims. *See supra* at 9–10; *see also* Ex. T-24, 08/10/22 Weinberg Depo. at 29:17–29:19 (NEMF Consultant testifying that

"UnitedHealthcare's audit rules are typically to provide a random sampling of 200 to 300 claims."). UnitedHealthcare imposed that limitation on NEMF to avoid insight and scrutiny about the propriety of its performance as a Claims Administrator. *See* Ex. T-24, 08/10/22 Weinberg Depo. at 30:5–30:7 (NEMF Consultant testifying that "insurance carriers really don't want a full, complete audit" and, therefore, they only permit plan administrators to "sampl[e]" claims); *id.* at 80:19–80:22 (testifying that **if a plan administrator**, **like NEMF**, **is forced to sample** "**only** … **200 claims**," **it does not** "**know whether** … **that 200-claim sampling is capturing the egregious errors**"); *id.* at 81:8–81:11 (testifying that BMI was "limited in[] what [it] c[ould] do because [it was] only looking at 200 … claims").

Notwithstanding UnitedHealthcare's refusal to produce any information outside of the CDD Datamart, including outpatient facility CPT and HCPCS codes, *see supra* at 21–23, and notwithstanding UnitedHealthcare's refusal to produce a "full reveal file" from the CDD Datamart, *see supra* at 24, and notwithstanding UnitedHealthcare forcing BMI to sample a mere 200 claims, *see supra* at 9–10, BMI unearthed a startling record of payment errors, *see supra* at 10, that plainly discredited the Performance Results, which UnitedHealthcare annually delivered to NEMF as the Plan Administrator. *See supra* at 17–18. It is unmistakable that, without these barriers to accessing information, the results of the Audit would have been worse for UnitedHealthcare. This is why UnitedHealthcare follows an institutional policy of non-disclosure and "**supply**[**ing**] **minimum**" information. *See* Ex. T-40, 06/27/22 Brown Depo. at 49:2–49:3 (emphasis added).

## J. DEFENDANTS' COMPENSATION AS CLAIMS ADMINISTRATORS

Over the period from 2014 to 2020, Defendants received **$6,169,606** of base-line compensation that the ASA describes as the "Standard Medical Service Fees" (the "**Standard Fees**"). *See* Dkt. 149 at 42 (Defendants acknowledging their receipt of a "$6.1 million" "[f]lat fee for general administrative services"); Ex. T-44 (listing all Standard Fees, represented as "ELG"); Ex. T-45 at ¶ 11. Defendants received these Standard Fees "for [their] services" as the Claims Administrators of the NEMF Plan, *see* Ex. T-1, ASA at § 5.1, and calculated their Standard Fees

based on the number of NEMF's and its subsidiaries' employees. *See id*. at Exhibit A (beginning in 2008, Defendants charged "$⬛ per month per [e]mployee").

Separate from their Standard Fees, Defendants used the NEMF Plan to generate additional revenue.  Over the period from 2014 to 2020, Defendants received additional fees in the amount of at least **$3,518,107** for, among other things, recovering payments that UnitedHealthcare should not have made to medical providers in the first place (the "**Extra Fees**"). *See, e.g.*, Dkt. 149 at 43 (Defendants acknowledging their receipt of "$3.5 million in additional fees"); Ex. T-45 at ¶¶ 12, 13.  By charging Extra Fees, Defendants increased their total revenue by **57%** over the period from 2014 to 2020—for total compensation of at least **$9,687,713**. *See* Ex. T-5, 06/28/22 Verga Depo. at 25:19–26:5, 29:4–31:1 (UHC Vice President testifying that, in addition to the Standard Fees, "there was some revenues attached to … programs that were also offered to [NEMF]").

Although Defendants received Standard Fees for reviewing, processing and paying healthcare claims as the Claims Administrators of the NEMF Plan, Defendants were intentionally derelict in performing these functions so they could acquire Extra Fees.  To accomplish this result, Defendants offered a variety of so-called "services" and "programs" that they should have been performing in the first instance as Claims Administrators—and they charged Extra Fees for each of those add-on services and programs.

### 1.    The Extra Fees Defendants Generated from "Recovery" Services

Defendants received Standard Fees for "**performing** … **benefit determinations and** [**making**] **payment**" on healthcare claims. *See* Ex. T-1, ASA at § 4.2 (emphasis added).  However, UnitedHealthcare regularly *overpaid* medical providers and then deployed "Claim Recovery Services" to "recover" those "[o]verpayments." *See id*. at § 4.10.  Defendants "retain[ed] … ⬛% of the gross recovery amount" as Extra Fees. *See id.* at Exhibit A ("Service Fee for Claim Recovery Services"); *see also* Ex. T-46 at CLANCY00048422 (the NEMF Consultant explaining that UnitedHealthcare was "**identifying a boatload of payment errors**" and "**the more errors that UHC makes and finds to correct the more [it] get[s] paid**") (emphasis added).

27

Similarly, Defendants received Standard Fees for **making** "**determinations concerning the <u>availability</u> of** [NEMF] **Plan benefits**." *See* Ex. T-1, ASA at § 4.2 (emphases added). However, UnitedHealthcare regularly used NEMF Plan assets to pay for healthcare claims for which the NEMF Plan was not responsible, and then deployed "Third Party Liability Recovery [Services]" to "recover" those payments that "should [not] have been made" by the NEMF Plan. *See id.* at § 4.11. Defendants "retain[ed] … ███ % of the gross recovery amount" as Extra Fees. *See id.* at Exhibit A ("Service Fee for … Third Party Liability Recovery"); *see also* Ex. T-47 (NEMF Consultant describing these Extra Fees as "**creative**" **charges**) (emphasis added).

Likewise, Defendants received Standard Fees for "**determin[ing] the <u>validity</u> of charges** submitted to … the [NEMF] Plan. *See* Ex. T-1, ASA at § 4.2 (emphases added). However, UnitedHealthcare deployed "Abuse and Fraud Management [Services]" to "recover" "abusive and fraudulent claims" submitted by medical providers, *see id.* at § 4.13, and Defendants charged Extra Fees "equal to … ███ % … of the gross recovery amount." *See id.* at Exhibit A ("Service Fee for Fraud and Abuse Management").

## 2.      The Extra Fees Defendants Generated from "Savings" Programs

In addition to the foregoing "services," Defendants used two "programs" to generate a substantial volume of Extra Fees: the "Facility Reasonable Charge" and "Shared Savings" programs. *See id.* at §§ 4.21, 4.22. Defendants deployed these two programs in tandem to retain between ██ % and ██ % of any purported "reductions" or "savings" they might obtain from medical providers on healthcare claims submitted to the NEMF Plan. *See id.* at Exhibit A ("Service Fee for Facility Reasonable Charge" and "Service Fee for Shared Savings Program").

Through these programs, medical providers were "**printing money for** [**UnitedHealthcare**]" **by submitting** "**a ridiculous bill**" for which UnitedHealthcare could negotiate a reduction. *See* Ex. T-48 at UHC00005556 (emphasis added). Worse yet, UnitedHealthcare was keenly aware that medical providers were "printing money" for Defendants. *See, e.g.*, Ex. T-36 at 00065693 (UHC Account Executive acknowledging that the Extra Fees are generated by "**notoriously high billers**") (emphasis added); Ex. T-49 at UHC00065733

28

(UnitedHealthcare employee acknowledging that the Extra Fees are generated by "**deep** … **discounts on claims** … **due to the excessive nature of how** [**medical providers**] **bill**"); Ex. T-5, 06/28/22 Verga Depo. at 63:22–64:9 (UHC Vice President testifying that **UnitedHealthcare is** "**aware of**" **and** "**track**[**s**]" "**the amounts that** [**medical providers**] **charge**") (emphasis added).

In November 2017, NEMF raised its concerns with UnitedHealthcare about these two programs. *See* Ex. T-48 at UHC00065555. The NEMF Consultant presented statistics from the prior three years in which—solely through the Extra Fees derived from the "Shared Savings" program—UnitedHealthcare increased its total annual compensation by 55% (in 2017), 45% (in 2016) and 52% (in 2015). *See id.* The NEMF Consultant also presented an example of UnitedHealthcare negotiating a $152,000 bill from a medical provider down to less than $8,000— and awarding itself Extra Fees in the amount of ██% of the so-called "savings" (*i.e.*, an Extra Fee of $██—██ times the payment made to the medical provider). *See id.* at UHC00065553, 56.

The UHC Account Executive sought assistance from his colleagues, stating that NEMF "thinks these [programs] are a money tree for us in fees and we are milking them." *See* Ex. T-50 at UHC00065722. **He also expressed his** "**concern**" **that** "**hospitals**" **were** "'**fudging' the bill**" **and thereby allowing UnitedHealthcare to extract Extra Fees**. *See* Ex. T-49 at UHC00065733 (emphases added). To extinguish the matter quickly, UnitedHealthcare discussed internally the possibility of terminating the savings programs. *See* T-50 at UHC00065721–22. The UHC Account Executive explained that **NEMF would** "**save about $700k in the fees we take**," **but UnitedHealthcare would** "**increase** [**NEMF's Standard Fees**] **for the lost fee revenue**." *Id.* at UHC00065722 (emphasis added). This quick-fix solution, in which UnitedHealthcare would maintain its revenue,[13] was unviable because NEMF merely wanted Defendants to control the costs of these two savings programs. As a result, the UHC Vice President offered a fair solution: "put a[n] annual cap in place … on a retroactive basis[.]" *See* Ex. T-52. His superior declined the proposal:

---

[13]     In November 2014, UnitedHealthcare similarly schemed to "increase" NEMF's Standard Fees "if NEMF decided to carve out" a service Defendants had been providing to the NEMF Plan. *See* Ex. T-51 at UHC00084178.

> We have to be concerned about setting precedent and this issue cuts across not only all of [our] Key Accounts, but National Accounts as well. **As a company we have been unwilling to enter into one-off agreements that cap our revenue**, so we have to be very careful…. **What kind of message are we sending if we return hundreds of thousands of dollars to [NEMF]? I think we are implying that they have been overcharged**.

*Id*. (emphasis added) (alteration to form).  Over the period from 2014 to 2020, Defendants collected $▮▮▮▮ of Extra Fees from their two "money tree" savings programs. *See* Ex. T-45 at ¶¶ 12.a–b.  In other words, for every ▮ dollars Defendants received in Standard Fees, they received one dollar in Extra Fees by accepting knowingly "excessive" and "fudg[ed]" bills from medical providers that were "notoriously high billers." *See supra* at 28–29.

### 3.   Defendants' Motivation for Charging Extra Fees

At his deposition, the UHC Vice President identified the two reasons why UnitedHealthcare delivers the foregoing "services" and "programs" to plan administrators: *first*, **they generate "revenue streams for UnitedHealthcare"** (*i.e.*, the Extra Fees), *see* Ex. T-5, 06/28/22 Verga Depo. at 27:6–27:12 (emphasis added); and, *second*, **UnitedHealthcare uses "[m]uch of that revenue" "to support [its] business relationship[s] with [third-party] vendors" in its "fully-insured business**," *id*. at 53:12–54:11, 57:10–57:19, which represents about one-half of UnitedHealthcare's operations. *See* Dkt. 149 at 5 (Defendants representing that "[a]pproximately 44% of United[Healthcare]'s employer plans are full-insured and approximately 56% are self-funded."). Thus, these add-on services and programs simultaneously enable UnitedHealthcare to increase its revenue and foster its relationships with third parties by generating additional revenue for them as well.

To avoid scrutiny about these purported "services" and "programs," UnitedHealthcare withheld information about them from NEMF (and other of its self-funded customers).  For example, the UHC Account Executive testified that he is not aware of any instance in which "UnitedHealthcare … provide[d]" a prospective customer with any "statistics" about its Claim Recovery Services "prior to entering into" an administrative services agreement. *See* Ex. T-3, 06/22/22 Serpico Depo. at 29:6–29:11.  He also could not "recall" any instance in which

UnitedHealthcare provided a prospective customer with "statistics" about the Shared Savings program and the Extra Fees UnitedHealthcare earned from it. *See id.* at 51:12–51:19, 52:6–52:12.

### 4. NEMF Discovers Defendants' Motivation for Charging Extra Fees

UnitedHealthcare promotes its add-on services and programs "as a value add" to obtain the Extra Fees those services and programs generate. *See* Ex. T-5, 06/28/22 Verga Depo. at 53:12–53:19. Over time, however, NEMF realized it had been duped because Defendants were charging ever-increasing amounts of Extra Fees for the Claims Administrator services they agreed to perform—and for which they earned Standard Fees. *See, e.g.*, Ex. T-2, 08/09/22 Eisenberg Depo. at 74:9–74:10 (NEMF CFO testifying that "**the fees were just getting out of hand**") (emphasis added); Ex. T-24, 08/10/22 Weinberg Depo. at 44:15–44:17, 45:14–45:15 (NEMF Consultant testifying that Defendants' add-on services and programs were "**not value added**" because they are "**an integral part of administering claims**" and **NEMF already was** "**paying [Standard Fees] for [Defendants] to adjudicate the claims**") (emphases added).

### K. THE BANKRUPTCY CASE AND THE NEMF PLAN'S TERMINATION

In February 2019, NEMF and its subsidiaries filed voluntary petitions for bankruptcy in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"). *See* Dkt. 169, UHC Answer at ¶¶ 21, 47; Dkt. 170, HP Answer at ¶ 47. "[A]s a part of the liquidation" in the Bankruptcy Case, NEMF terminated the NEMF Plan because NEMF "was closing down." *See* Ex. T-4, 08/08/22 Lomuti Depo. at 45:17–46:19, 65:15–66:6. The NEMF Plan terminated on July 31, 2019. *See* Dkt. 169, UHC Answer at ¶¶ 21, 49; Dkt. 170, HP Answer at ¶¶ 21, 49. For six months thereafter, Defendants maintained their positions as Claims Administrators and "United[Healthcare] continued processing and paying certain claims" for the NEMF Plan (the "**Runoff Period**"). *See* Dkt. 169, UHC Answer at ¶ 21; Dkt. 170, HP Answer at ¶ 21; *see also* Ex. T-5, 06/28/22 Verga Depo. at 17:6–17:9 (UHC Vice President testifying that, during the Runoff Period, UnitedHealthcare "performed claim administration services").

"[T]he Bankruptcy Court held a confirmation hearing on January 14, 2022, and entered an order thereafter" confirming NEMF's and subsidiaries' plan of liquidation (the "**Confirmation**

**Order**"). *See* Dkt. 169, UHC Answer at ¶ 21.  In the Confirmation Order, the Bankruptcy Court approved the formation of the Liquidating Trust to acquire NEMF's and its subsidiaries' remaining assets, including claims and causes of actions. *See* Dkt. 156 at 14.  Also in the Confirmation Order, the Bankruptcy Court appointed Kevin P. Clancy as the Trustee of the Liquidating Trust. *See* Dkt. 169, UHC Answer at ¶ 30; Dkt. 170, HP Answer at ¶ 30.  The Bankruptcy Court charged the Trustee with the duty to pursue and recover, among other things, "over payments from the self-funded plan [*i.e.*, the NEMF Plan]." *See* Dkt. 156 at 5.

## L.   DEFENDANTS' CONCEALMENT OF EVIDENCE FROM THE TRUSTEE

In November 2020, prior to commencing this case against Defendants, the Trustee served subpoenas on UnitedHealthcare and Harvard Pilgrim to obtain documents concerning the NEMF Plan (together, the "**Subpoena**"). *See* Dkt. 169, UHC Answer at ¶¶ 21, 52; Dkt. 170, HP Answer at ¶¶ 21, 52.  Harvard Pilgrim refused to produce any documents to the Trustee, *see* Ex. T-53, and UnitedHealthcare produced only a "subset" of the data the Trustee requested by delivering "standard data extracts" from the CDD Datamart—with suppressed data—for healthcare claims it paid over the period from 2017 to 2020. *See, e.g.*, Dkt. 169, UHC Answer at ¶ 21 ("United[Healthcare] admits that it responded to the [S]ubpoena with 2017-2020 [d]ata and that such data had certain provider discount information suppressed").  The Trustee commenced this action on August 17, 2021 by filing a one-count complaint against Defendants for breaching their fiduciary duties under ERISA. *See generally* Dkt. 1.

### 1.   The Trustee's Requests for Underlying Data and Claims Information

On November 12, 2021, the Trustee served production requests on Defendants. *See, e.g.*, Dkt. 46-1 (the "**Production Requests**").  The Production Requests sought information that would enable the Trustee to determine the propriety of Defendants' payments as the Claims Administrators of the NEMF Plan. *See* Dkt. 34 at 3–4 (on November 12, 2021, the Trustee discussing "the document-focused nature of this case" and the importance of Defendants producing "relevant data and documents over the period from January 2014 through the conclusion of their services to the NEMF [] Plan in 2020").

In the Production Requests, the Trustee sought two types of information from Defendants about the healthcare claims they processed and/or paid over the period from 2014 to 2020: **(i)** underlying data about the healthcare claims (the "**Underlying Data**"), *see, e.g.,* Dkt. 46-1 at ECF p. 10 (Request No. 1); *id.* at ECF p. 9 (explaining that "these [Production R]equests seek … claims, eligibility and related Data … and … other Documents and information such as agreements, contracts, and Communications") (emphasis removed); and **(ii)** certain additional information about the healthcare claims (collectively, the "**Claims Information**"), including:

- "**[p]rovider contracts**," *see id.* at ECF p. 12 (Request No. 5) (emphasis added);

- "**[p]rovider**" "**bills**," *see id.* at ECF p. 14 (Request No. 10) (emphasis added);

- "**payment policies**," *see id.* at ECF p. 12 (Request No. 5) (emphasis added);

- "**reimbursement methodology**" **information**, *see id.* (emphasis added);

- "**fee schedules**," *see id.* (emphasis added);

- "**remittance**" **advices**, *see id.* at ECF p. 14 (Request No. 12.c) (emphasis added);

- "**any other**" **information showing** "**how a given medical claim's reimbursement amount was established/calculated**," *see id.* at ECF p. 12 (Request No. 5) (emphasis added); and

- "**[c]ommunications concerning**" "**benefit claim determinations**." *See id.* at ECF p. 15 (Request No. 17) (emphasis added).

Defendants are in possession of all of the Underlying Data, which exists primarily in the CDD Datamart and the Galaxy Data Warehouse. *See supra* at 20–22.  Defendants also are in possession of the Claims Information, which exists outside of the CDD Datamart and Galaxy Data Warehouse. *See supra* at 20; *see also infra* at 36.

## 2. Defendants Asserted that the Trustee Was Not Entitled to the Claims Information and that the Claims Information Was Irrelevant

As a litigation strategy, Defendants now assert that the Trustee cannot prove whether they paid healthcare claims in error because they did not produce Claims Information in discovery. *See infra* at 37–40.  However, in response to the Production Requests, UnitedHealthcare contended that **the Claims Information**: <u>(i)</u> **was** "**in excess of the [Trustee's] discovery rights** … **under the ASA**," *see* Dkt. 46-2 at ECF pp. 17, 24, 27, 33–34 (Response Nos. 5, 10, 12, 16, 17) (emphasis

added); and (ii) **was** "**unnecessary to proving the claims at issue in this case**." *See id.* at ECF pp. 17, 25, 28, 34 (Response Nos. 5, 10, 12, 16, 17) (emphasis added).  Harvard Pilgrim responded similarly, stating that: (i) **the Production Requests sought information** "**in excess of the** [**Trustee's**] **discovery rights** … **under the ASA**," *see* Dkt. 46-3 at ECF pp. 13, 19, 21, 26–27 (Response Nos. 5, 10, 12, 16, 17) (emphasis added); and (ii) **the requested productions** "**would not provide any material relevant information**." *See id.* at ECF p. 2 (emphasis added).

### 3.     Defendants Limited Their Productions to the Underlying Data

As a further strategy to conceal the Claims Information from the Trustee, Defendants asserted that UnitedHealthcare's "standard data extracts"—which do not include any Claims Information—should satisfy their production obligations. *See, e.g.*, Dkt. 46-4 at ECF p. 34 (Defendants' counsel stating that the "standard data extract" "contains much of the information sought by [the] Trustee" and "contains <u>more</u> information than … UHC would find necessary to reprice claims") (**emphasis in original**); *see also supra* at 5 n.3 (defining "pricing").

In addition to misrepresenting the discovery value of the "standard data extracts," Defendants insisted that the Trustee's discovery rights were contractually limited to an "audit" under the ASA, *see* Ex. T-1, ASA at § 9.3, and, therefore, Defendants could satisfy their production obligations by delivering only the "standard data extracts" they produce to auditors outside of litigation when the Federal Rules do not apply and control. *See, e.g.*, Dkt. 50-8 at ECF p. 13 (on January 14, 2022, Defendants resisting productions of information "not in the standard data extract used by UHC for third-party audits"); Dkt. 50-8 at ECF p. 21 (on December 22, 2021, Defendants' counsel stating "that the standard data extract UHC produced in [response to the Subpoena], and we will produce here, is of the form UHC regularly provides for external audits"); Dkt. 50 at ¶ 15 (on March 9, 2022, Defendants asserting that the "scope" of permissible discovery is "limited" to "[s]ection 9.3" of the ASA).

### 4.     In April 2022, the Court Rejected Defendants' Efforts to Limit Discovery

For the first **five months** of discovery—from November 12, 2021 through April 7, 2022— Defendants refused to collect and produce the Claims Information, instead asserting that (i) the

Trustee *was not entitled* to it and (ii) the Trustee *did not need* it. *See, e.g.*, Dkt. 50-4 at ECF p. 4 (on March 31, 2022, Defendants asserting that the Production Requests sought information "beyond what would be allowed to a customer [in] the ASA's audit provision," "and of course United[Healthcare] continues to believe that the additional data is irrelevant"). Defendants also refused to produce the Underlying Data to the Trustee, including CPT/HCPCS codes for facility claims. *See, e.g.*, Dkt. 50 at ¶ 5.a (in April 2022, the Trustee moving to compel this Underlying Data).

On April 7, 2022, the Court conducted a hearing on the Trustee's several discovery motions (the "**April Hearing**"). *See* Dkts. 48, 49, 50. During the April Hearing, the Court rejected Defendants' arguments that (i) the Trustee was not entitled to requested information and (ii) the information was irrelevant. *See* Dkt. 57, 04/07/22 Tr. at 8:4–8:5 ("Your assertion that the ASA is essentially a limiter on discovery, I reject that completely."); *id*. at 10:9–10:11 ("[Y]ou need to expand your view on relevance because I disagree with the way you're trying to cabin it[.]"). Defendants disregarded the Court's admonitions at the April Hearing and continued to take the position that they are exempt from the Federal Rules.

> **5.** **In July 2022, Defendants Revealed Their Plan to Produce Claims Information, But Only for Their Secret 250-Claim Discovery Sample**

As of June 2022, Defendants still had refused to produce all Underlying Data to the Trustee—and had not produced any Claims Information whatsoever. On June 23, 2022, the Trustee moved for sanctions because Defendants were withholding CPT and HCPCS codes from the Trustee concerning the high-priced outpatient facility claims they paid. *See, e.g.*, Dkt. 61 at ¶ 13. The Court held a hearing on June 29, 2022 (the "**June Hearing**"), *see* Dkt. 74, and appointed a special master (the "**Special Master**") to address Defendants' discovery productions. *See* Dkt. 73. From July 1 to July 13, 2022, the Special Master convened five conferences with the parties' counsel. *See* Brooks Decl. at ¶ 61.

On July 26, 2022, the Special Master convened a sixth conference; at that time, Defendants revealed that they handpicked a "sample" of 250 healthcare claims (the "**Discovery Sample**") and would be producing select Claims Information—but only for the healthcare claims in the

Discovery Sample. *See id.* at ¶ 62.  As a result, on August 18 and 23, 2022, the Court entered two of its three Preclusion Orders in this case. *See* Dkt. 81 at 2–3; Dkt. 83 at 2–3 ("Defendants are precluded from using at trial any plan data … for the … Error Categories that was not produced in discovery … including by extrapolating conclusions regarding any unproduced requested plan data from a sample of produced plan data").

Defendants moved the Court to reconsider those two Preclusion Orders, and identified the Claims Information they included in their Discovery Sample—all of which the Trustee sought in the Productions Requests:

| Claims Information Type | Defendants' Admitted Use of Claims Information in Their Discovery Sample | Trustee's Requests for Claims Information |
|---|---|---|
| Provider Contracts | Dkt. 93 at ECF p. 15 | *See supra* at 33 |
| Provider Bills | | |
| Payment Policies | | |
| Fees Schedules | | |
| Communications/Letters | | |
| Remittance Advices | Dkt. 93 at ECF p. 16 | |

Defendants produce this information by, among other things, taking "screenshot images from [their] computer systems," including from the TOPS/UNET System. *See, e.g.*, Dkt. 93 at ECF pp. 9, 15.

### 6. Defendants Withheld the Underlying Data to Prevent the Trustee from Obtaining Any Claims Information

To prevent the Trustee from gaining access to any Claims Information over nine months of fact discovery, Defendants resisted producing their Underlying Data, requiring the Trustee to file four discovery motions, Dkts. 46, 50, 61, 96, which resulted in three hearings on those motions, *see* Dkts. 57, 74, 162, three significant amendments to the case schedule, *see* Dkts. 59, 72, 164, and the Court's appointment of the Special Master. *See* Dkt. 73; *see also* Dkt. 162, 11/30/22 Tr. at 91:17–92:8 (Trustee's counsel explaining that Defendants resisted producing, and untimely produced, the Underlying Data to prevent the Trustee from identifying a narrower set of Claims Information that he could accept in satisfaction of his Production Requests).

Defendants did not complete their production of the Underlying Data until December 22, 2022—*i.e.*, *thirteen months* after the Trustee served his Production Requests and *four months* after the fact-discovery deadline. *See* Dkt. 72 at 2 ("Discovery SHALL conclude by August 19, 2022."); Dkt. 168 (the Court ordering Defendants to produce Underlying Data to the Trustee "by December 23, 2022"); *see also supra* at 6 n.4 (discussing same). And Defendants failed to produce **any** Claims Information whatsoever, except in connection with their handpicked, 250-claim Discovery Sample that Defendants kept secret from the Trustee, the Special Master and the Court for eight months. *See supra* at 35–36.

**7.      Defendants Now Assert that the Trustee Cannot Prove Any Payment Errors Without the Claims Information They Withheld in Discovery**

In September 2022, Defendants asked their three expert witnesses to collectively offer **seven opinions** (of eight total) that the Trustee cannot prove any payment errors without reviewing and considering the Claims Information; in other words, the Trustee cannot prove any payment errors by relying on the only information Defendants produced to him between November 2021 and December 2022—*i.e.*, Underlying Data from the CDD Datamart and the Galaxy Data Warehouse. *See, e.g.*, Dkt. 162, 11/30/22 Tr. at 68:25–69:3 (Defendants' counsel explaining that "[w]hat we ended up doing in order to give them [the Underlying Data] that they wanted was to [produce a] report that drew both from the CDD Datamart and from … Galaxy"); Ex. T-40, 06/27/22 Brown Depo. at 54:8–54:12 (UnitedHealthcare designee testifying that "[w]e have sent [the Trustee] numerous extract files" from the CDD Datamart and "even passed on … the Galaxy Data Warehouse to provide additional [Underlying Data]" about outpatient facility claims).

Defendants' three experts are Mr. Cannon, Mr. Patrick Travis and Dr. Kongstvedt. The Court already excluded Mr. Cannon's second opinion, in which he posited that the Trustee cannot prove payment errors without reviewing "**reimbursement methodology** materials," "which include[] **provider contracts**, **fee schedules**, and **medical documentation**"; therefore, the "Trustee did not take the steps to collect … necessary information" and cannot "challenge the propriety of United[Healthcare]'s payment of claims." *See* Dkt. 167 at 5 (emphasis added) (the

Court quoting Mr. Cannon's now-excluded opinion). Given that Mr. Cannon's opinion is based on unproduced Claims Information (that the Trustee requested on November 12, 2021), the Court held that "Mr. Cannon's expert testimony violates the … Preclusion Order[s]." *See id*. at 5.

The remaining **six opinions** of Defendants' experts are based on the same position. In Mr. Cannon's first opinion, he offers several theories to attempt to whittle down the total amount of damages in the Error Categories to $7.8 million. *See supra* at 7. From there, Mr. Cannon asserts that the Trustee has "taken preliminary data analysis steps but h[as] not taken the **additional steps** needed [to] … prove [that claims] were improperly paid." *See* Ex. T-9, Cannon Report at ¶ 182 (emphasis added). Mr. Cannon identifies those additional steps, asserting that "a review of detailed claims documentation … is required … including … the **provider bill**, **claim adjudication screen**, **claim eligibility screen**, applicable **payment policy**, … **provider contract**, … **claim correspondence**, or **provider remittance advice**…. To my knowledge, neither the Trustee nor his experts have performed such a review." *Id*. at ¶ 4 (emphasis added); *see supra* at 33 (identifying the Trustee's requests for this Claims Information). Mr. Cannon also explains that he "conducted" those additional steps using the Claims Information that Defendants produced for their 250-claim Discovery Sample. *See* Ex. T-9, Cannon Report at ¶ 4.

Mr. Travis offers two opinions (of three total) designed to create a dispute over the damages that Mr. Cannon cannot attempt to whittle away. His first opinion expressly criticizes the Trustee for analyzing the Error Categories according to the only information Defendants produced (*i.e.*, extracts from the CDD Datamart and reports from the Galaxy Data Warehouse): "Opinion 1: Trustee's experts have only analyzed **extracted claims data**" and "[t]heir conclusions thus are at most 'suspected errors' that do not support conclusions that claims have not been properly paid." *See* Ex. T-54, Patrick Report at 2 (emphases added). In his first opinion, Mr. Travis also expressly identifies the "additional information" the Trustee needed to review, "including … the **provider bill**, the applicable **payment policy**, the **provider contract** and **fee schedule**, … **claim correspondence**, and **remittance advice**." *See id*. at ¶ 51 (emphasis added); *see also supra* at 33 (identifying the Trustee's requests for this Claims Information). Mr. Travis's second opinion is

more of the same.  He opines that "claims administrators are … able to correctly adjudicate and pay claims with missing data based on **other information**." *See* Ex. T-54, Patrick Report at 33 (emphasis added).  Mr. Travis explains that this "other information" is "**stored in the claim administrators**' **claims system**, … **found on the claim itself**, **or** … **found in other source documents related to the claim**." *See id.* at ¶72 (emphasis added); *see also supra* at 33 (identifying the Trustee's requests for this Claims Information).

Dr. Kongstvedt offers three opinions that the Trustee cannot prove damages because he failed to consider anything beyond the Underlying Data.  In support of his first opinion, Dr. Kongstvedt states that "the Trustee's experts limited their review to **extracts of electronic data** …." *See* Ex. T-55, Kongstvedt Report at ¶ 16 (emphases added).  He continues by identifying the additional information the Trustee's experts should have considered, including "the **underlying claims information** … **explanations of benefits**, **remittance advices**, United benefit **screenshots**, **provider agreements**, **fee schedules**, … [and] **payment methodologies** …." *See id.* (emphasis added); *see also supra* at 33 (identifying the Trustee's requests for this Claims Information).  Dr. Kongstvedt also precisely describes why the Trustee included Count II in his FAC, stating that the Trustee's experts failed to consider "the information that <u>was</u> … stored in United[Healthcare]'s database of claims," but, "[i]nstead, they assert that many of the identified claims should have been rejected based on the … information" that Defendants actually produced in discovery. *See* Ex. T-55, Kongstvedt Report at ¶ 20 (emphasis in original).  In support of his second opinion, Dr. Kongstvedt states that the Trustee's experts needed to undertake "a fact intensive analysis of **a number of sources** that … impact the assessment of the amount payable," such as "**provider contractual agreements** …." *See id.* at ¶ 30 (emphasis added).  Similarly, in support of his third opinion, Dr. Kongstvedt asserts that the Trustee's experts considered only "**a single electronic claims file**" but should have considered "**payment methodologies**, or the terms of the applicable **provider agreement**[,] including **fee schedules** …." *See id.* at ¶ 33 (emphasis added); *see supra* at 33 (identifying the Trustee's requests for this Claims Information).

The only opinion that Defendants intend to offer the Court at trial, which does not violate the Preclusion Orders, is Mr. Travis's third opinion, in which he attempts to justify UnitedHealthcare's use of "homegrown" codes as a strategy to misdirect parties that receive "a claims data extract." *See* Ex. T-54, Patrick Report at 3; *see also supra* at 22 (discussing same).

## III.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the record shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Simply Wireless, Inc. v. T-Mobile US, Inc.*, No. 21-597, 2022 WL 16573997, at *5 (E.D. Va. Nov. 1, 2022) (quoting FED. R. CIV. P. 56(c)).   "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "Whether a fact is considered 'material' is determined by the substantive law, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).   "The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Id.*

### B.   COUNT I:  DEFENDANTS' BREACHES OF THEIR ERISA FIDUCIARY DUTIES

In Count I of the FAC, the Trustee seeks "appropriate relief under section 1109 of [Title 29]." *See* FAC at ¶ 31 (quoting 29 U.S.C. § 1132(a)(2) (2014)).   Section 1109 imposes liability on "a fiduciary … who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" under ERISA. *See infra* 51 (quoting 29 U.S.C. § 1109(a) (1974)).   Also under Count I, the Trustee seeks "other appropriate equitable relief … to redress … violations" of ERISA's "provision[s]." *See* FAC at ¶¶ 29, 31 (citing 29 U.S.C. § 1132(a)(3)).   "This 'catchall' provision 'act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Peters v. Aetna Inc.*, 2 F.4th 199, 216 (4th Cir. 2021) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)).

### 1.     ERISA Fiduciary Duties Are the "Highest Known to the Law"

"ERISA establish[es] standards of conduct, responsibility, and obligation[s] for fiduciaries of employee benefit plans." *Peters*, 2 F.4th at 215 (internal quotation marks and citation omitted). ERISA fiduciary duties are "the highest known to the law," *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 469 (4th Cir. 2020) (internal quotation marks and citation omitted), and are "'derived from the common law of trusts.'" *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275 (4th Cir. 2019) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015)).  Trust law and ERISA recognize three distinct duties by which fiduciaries must abide: (i) **the duty of loyalty**, *see infra* at 43–45; (ii) **the duty to disclose material information**, *see infra* at 45–46; and (iii) **the duty of prudence**. *See infra* at 47–49.

### 2.     ERISA Fiduciaries Cannot Contract Around Their Fiduciary Duties

When Congress enacted ERISA nearly five decades ago, it provided that "any provision in an agreement or instrument which purports to relieve a fiduciary from … any responsibility, obligation, or duty … shall be void as against public policy." 29 U.S.C. § 1110(a) (1974); *see also, e.g., Russell v. Harman Int'l Indus., Inc.*, 945 F. Supp. 2d 68, 74 (D.D.C. 2013) (explaining that section 1110 voids contractual provisions "altering a fiduciary's statutory duties and responsibilities") (internal quotation marks and citation omitted).  Thus, Defendants cannot rely on the terms of the ASA to redefine and recast their fiduciary duties.

### 3.     The Three Elements of an ERISA Fiduciary-Breach Case

"[T]he elements of a claim for breach of fiduciary duty under ERISA are: (1) that the defendant was a fiduciary of the ERISA plan; (2) that the defendant breached its fiduciary responsibilities under the plan; and (3) that the plan suffered a loss from the defendant's breach." *Sims v. BB&T Corp.*, No. 15-732, 2018 WL 3128996, at *5 (M.D.N.C. June 26, 2018) (citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 361 (4th Cir. 2014)).

#### a.     Element 1:  Defendants Were Fiduciaries of the NEMF Plan

A defendant in an ERISA action is an ERISA "fiduciary" if it is either a "named fiduciary" or a "functional fiduciary" of an ERISA-governed plan. *See Dawson-Murdock*, 931 F.3d at 275–

76 (internal quotation marks and citations omitted).  If the defendant is expressly "named" as a plan fiduciary, the inquiry ends there. *See, e.g, id*. at 277–78.  If the defendant is <u>not</u> a named fiduciary, the "functional fiduciary" test asks whether the defendant "exercises any discretionary authority or discretionary control" in the administration of an ERISA plan. *See id*. at 276; *see also* 29 U.S.C. § 1002(21)(A)(iii) (2019) (same).  Here, both Defendants are expressly-named fiduciaries of the NEMF Plan. *See supra* at 3 (quoting Ex. T-1, ASA at § 4.2).  That ends the inquiry and, therefore, Harvard Pilgrim's attempt to disavow its status fails. *See Dawson-Murdock*, 931 F.3d at 277 (explaining that "we are now confronted with" a "named fiduciar[y] … disclaim[ing] [its] fiduciary roles and responsibilities in the federal courts," and ruling that, "as logic would suggest, a named fiduciary is an ERISA fiduciary") (internal quotation marks and citation omitted).

Moreover, "[a] fiduciary with respect to a plan shall be liable for a breach … of another fiduciary with respect to the same plan … if, by his failure to comply with … his specific [fiduciary] responsibilities … he has enabled such other fiduciary to commit a breach." *See* 29 U.S.C. § 1105(a)(2) (1974).  "Section 1105(a)(2) does not require any knowledge of what the co-fiduciary is doing in order to impose liability." *Longo v. Trojan Horse Ltd.*, 208 F. Supp. 3d 700, 708 (E.D.N.C. 2016).  Instead, a fiduciary's failure to "monitor" the conduct of its co-fiduciary establishes liability. *See, e.g.*, *Reetz v. Lowe's Cos., Inc.*, No. 18-75, 2019 WL 4233616, at *8 (W.D.N.C. Sept. 6, 2019) (explaining that a fiduciary is "is liable as a co-fiduciary under 29 U.S.C. § 1105(a)(2) to the extent that [it] fail[ed] … to monitor [and] enabled [another fiduciary] to commit a breach of its fiduciary duties").  It is undisputed that Harvard Pilgrim failed to monitor UnitedHealthcare's activities and conduct that resulted in losses to the NEMF Plan. *See supra* at 6.  Thus, Harvard Pilgrim, at a minimum, is jointly and severally liable for UnitedHealthcare's breaches of fiduciary duties to the NEMF Plan.

### b.     Element 2:  Defendants' Breaches of Their Fiduciary Duties

The undisputed evidence demonstrates that UnitedHealthcare breached its (i) duty of loyalty, (ii) duty to disclose material information and (iii) duty of prudence.

###### i.     The Duty of Loyalty

"[A] fiduciary shall discharge his duties with respect to a plan **solely** in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1) (2019) (emphasis added), and "shall not … deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1) (1974).  These statutes form the bedrock of the duty of loyalty, which (i) mandate "that all decisions regarding an ERISA plan ... be made with an eye single to the interests of the [plan]," (ii) prohibit "self-dealing" and (iii) require "a fiduciary to act for the exclusive purpose of prov[id]ing benefits." *Peters*, 2 F.4th at 228 (internal quotation marks and citations omitted).

The duty of loyalty also "is known as the 'exclusive benefit' rule" and is "one of the most fundamental and distinctive principles of trust law." *Halperin v. Richards*, 7 F.4th 534, 545–46 (7th Cir. 2021) (internal quotation marks and citation omitted).  "By importing the trust form and its duty of loyalty into benefit plans, ERISA drew from a familiar legal framework to protect plans from the kind of internal misuse that motivated ERISA's enactment." *Id*. at 546.  "[A]ny administrator that favors its own interests over its beneficiaries in its dealings violates its fiduciary duty of loyalty." *Acosta v. WH Adm'rs, Inc.*, 449 F. Supp. 3d 506, 519 (D. Md. 2020).  "Good faith does not provide a defense" to a breach of the duty of loyalty. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007).

UnitedHealthcare breached its duty of loyalty in three distinct ways.  **_First_**, the "duty of loyalty precludes a fiduciary from making **material misrepresentations**." *Helton v. AT&T, Inc.*, 805 F. Supp. 2d 234, 248 (E.D. Va. 2011) (emphasis added) (quoting *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)).  Here, UnitedHealthcare delivered annual Performance Results to the Plan Administrator of an ERISA-governed healthcare plan, in which UnitedHealthcare misrepresented that it was processing claims at near-perfect accuracy rates at or above 99.00%. *See supra* at 17–18.  In contrast to those fictional rates, Defendants have no genuine dispute remaining for trial concerning at least $11,570,866 of damages in the Error Categories, *see supra* at 6–8, which represents an accuracy rate of 91.5% of the $135 million of medical claims UnitedHealthcare paid over the period from 2014 to 2020. *See* Ex. T-26 at ¶ 17.  UnitedHealthcare

concedes that a 95% accuracy rate is "very low," and that "[it]'d be out -- not out of business, but ... would not have the customer base [it has]" if it delivered Performance Results to plan administrators reflecting a 95% accuracy rate. *See supra* at 19.

      **Second**, the duty of loyalty precludes a fiduciary from "ma[king] decisions benefitting itself or a third party." *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 513 (D.N.J. 2021) (internal quotation marks and citations omitted); *see also Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1308 (D. Minn. 2021) ("Perhaps the most fundamental duty of a [fiduciary] is that he must ... **exclude all selfish interest and all consideration of the interests of third persons**.") (emphasis added) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000)). The undisputed evidence demonstrates UnitedHealthcare's unbending loyalty to its relationships with third parties over the interests of the NEMF Plan.  In 2014, UnitedHealthcare rejected NEMF's proposal to "achieve more significant results" in hospital audits for the stated reason that NEMF's proposal would affect UnitedHealthcare's "**contracts** **with** ... **existing vendors**." *See supra* at 14.  Likewise, in 2015, UnitedHealthcare rejected NEMF's proposal to control the submission of "fraudulent" claims to the NEMF Plan for the stated reason that NEMF's proposal "may adversely affect **UHC's contractual relationships**" **with medical providers**. *See supra* at 14.  And throughout the period from 2014 to 2020, UnitedHealthcare refused to reimburse the NEMF Plan for untimely-identified overpayments it made because **UnitedHealthcare agreed with its in-network medical providers that they could retain those overpayments**. *See, e.g.*, Ex. T-37 at UHC00044789 (in 2019, the UHC Account Executive stating that "[c]ontractually for all par[ticipating] providers we cannot adjust for ... overpayments ... that are beyond 12 months from the date [an overpayment] was processed"); Ex. T-56 (in 2014, the UHC Account Executive stating that "our network contracts will not permit us to try and collect an overpayment on a claim that is more than 12 months old").

      **Third**, a fiduciary breaches its duty of loyalty **when it acts for the purpose of** "**increas**[**ing**] **the compensation** ... **received for its administration services**." *Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945, 948 (C.D. Cal. 2016) (emphasis added); *see also Nelsen v. Principal*

*Glob. Invs. Tr. Co.*, 362 F. Supp. 3d 627, 639 (S.D. Iowa 2019) (agreeing that section 1104(a)(1) applies to "decisions [made] not in the best interest of the participants but instead to … receive … fees"); *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 466, 471 (S.D.N.Y. 2014) (ruling that the trustees of "self-insured health benefit plans" stated a breach of fiduciary duty claim against the plans' administrators on allegations that they "**increas[ed]** … **administrative fee[s] by improperly adjudicating claims**") (emphasis added).

The undisputed evidence demonstrates that, over the period from 2014 to 2020, Defendants misused the NEMF Plan to generate revenue for themselves. *See supra* at 29, 29 n.13 (UnitedHealthcare twice plotting to **fraudulently increase its Standard Fees to offset** "**lost** … **revenue**" **from its Extra Fees**); *see supra* at 26–31 (Defendants enhancing their total compensation from $6.1 million to $9.6 million by **charging Extra Fees for services and programs that were** "**not value added**" **and for which Defendants were compensated through their Standard Fees**); *see supra* at 30 (UnitedHealthcare **charging Extra Fees** "**to support [its] business relationship[s]** with [third-party] vendors" that UnitedHealthcare uses in its "fully-insured business"); *see supra* at 29–30 (UnitedHealthcare refusing to cap its Extra Fees to avoid acknowledging that **NEMF** "**ha[d] been overcharged**"); *see supra* at 28–29 (Defendants collecting Extra Fees for **accepting knowingly** "**excessive**" **and** "**fudg[ed]**" **invoices from** "**notoriously high [medical provider] billers**"); *see supra* at 15 (UnitedHealthcare refusing to implement safeguards to control "fraudulent" claims because Defendants were receiving Extra Fees for their Abuse and Fraud Management Services); *see supra* at 15–16 (UnitedHealthcare refusing to allow NEMF to audit out-of-network claims because Defendants were receiving Extra Fees for the their Facility Reasonable Charge and Shared Savings programs).

### ii.  The Duty to Disclose Material Information

"'The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA.'" *Helton*, 805 F. Supp. 2d at 248 (quoting *Griggs*, 237 F.3d at 380). ERISA, like the common law, embraces "'two instances where a [fiduciary] is under a duty to inform.'" *Id*. (quoting *Griggs*, 237 F.3d at 380).

***First***, a fiduciary must supply "<u>upon request</u> complete and accurate information." *Id.* (emphasis added) (quoting *Griggs*, 237 F.3d at 380).   ***Second***, a fiduciary must <u>affirmatively disclose</u> "material facts" "to prevent or redress a breach of trust." *Id.* (internal quotation marks and citations omitted).   In other words, a fiduciary has "an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *Id.* at 248–49 (quoting *Griggs*, 237 F.3d at 380).

UnitedHealthcare breached both duties of disclosure.   Over the period from 2014 to 2020, UnitedHealthcare regularly rejected NEMF's <u>requests</u> for information about the NEMF Plan's operations and UnitedHealthcare's performance as a Claims Administrator. *See supra* at 16–17 (listing evidence of UnitedHealthcare's refusal to produce <u>requested</u> information; *see supra* at 23–25 (UnitedHealthcare refusing to produce <u>requested</u> NEMF Plan data and withholding a "**full reveal file**" to prevent insight into its performance as a Claims Administrator).

In addition to rejecting the Plan Administrator's requests for information concerning the NEMF Plan, UnitedHealthcare also failed to <u>affirmatively disclose</u> material information about its performance as a Claims Administrator.   In 2014, in connection with the Audit, UnitedHealthcare produced standard data extracts to BMI, without any disclosure that those extracts from the CDD Datamart **<u>exclude</u> "the data necessary to determine whether a claim has been properly paid" and only contains "a subset of claims data" that "does not attempt to capture data on each and every aspect of a claim.**" *See supra* at 22.   Also in connection with the Audit, UnitedHealthcare "suppressed" data from the already-limited information it delivered to BMI for the purpose of selecting a "sample" of claims, *see supra* at 23–25, and did "not provide[]" data that would have revealed instances of medical providers submitting fraudulent claims. *See supra* at 14.   Further, in 2015, UnitedHealthcare failed to inform NEMF about the UHC Account Executive's concerns that "Claims Processing" was "exploding with issues" that were as "bad" as he could recall "in all [his] years" at UnitedHealthcare. *See supra* at 11.   And, of course, the Trustee discovered for himself in this case the alarming volume of healthcare claims that UnitedHealthcare improperly paid over the period from 2014 to 2020—at least $11,570,866 as to which Defendants have no genuine dispute remaining for trial. *See supra* at 6–8.

46

### iii.     The Duty of Prudence

The common law of trusts has long imposed on a fiduciary "an overall duty to administer [a] trust as a prudent person would and must exercise reasonable care, skill, and caution in doing so." *See, e.g.*, GEORGE G. BOGERT, *The Law of Trusts and Trustees* § 541 (2023).  Likewise, under ERISA, "a fiduciary shall discharge his duties with respect to a plan … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (2019).  This is the duty of prudence, *see, e.g.*, *Tatum*, 761 F.3d at 356, and "the appropriate benchmark with which to judge a fiduciary's [prudence] is an objective one measured against the standard of the … industry." *DiFelice v. U.S. Airways, Inc.*, 436 F. Supp. 2d 756, 784 (E.D. Va. 2006) (internal quotation marks and citations omitted).  Importantly, "good faith" is not a defense; "a pure heart and an empty head are not enough." *DiFelice*, 497 F.3d at 418 (internal quotation marks and citation omitted).

Courts uniformly recognize that the claims administrator of a self-funded healthcare plan breaches its duty of prudence by *overpaying* healthcare claims that it was charged to process and pay accurately. *See, e.g., Comau LLC v. Blue Cross Blue Shield of Mich.*, No. 19-12623, 2020 WL 7024683, at *1–2, 5, 8 (E.D. Mich. Nov. 30, 2020) (allowing plan administrator's breach of fiduciary duty claim to go forward on allegations that the self-funded plan's claims administrator "**overpaid**" approximately $800,000 of claims as a result of a "flawed" "processing system" that resulted in "the payment of improper claims") (emphasis added); *Grp. 1 Auto., Inc. v. Aetna Life Ins. Co.*, No. 20-1290, 2020 WL 8299592, at *3 (S.D. Tex. Nov. 9, 2020) (allowing plan administrator's breach of fiduciary duty claim to go forward against the claims administrator of a self-funded plan, and stating that "[**i**]**t is quite obvious that no prudent** [**claims**] **administrator would approve claims payments for non-covered claims**.") (internal quotation marks and citation omitted); *Band v. Blue Cross Blue Shield of Mich.*, 183 F. Supp. 3d 835, 837–38, 842 (E.D. Mich. 2016) (allowing plan administrator's breach of fiduciary duty claim to go forward on allegations that the self-funded plan's claims administrator "**used** [**p**]**lan assets to overpay for**

[**medical**] **services**") (emphasis added); *Hornady Transp. LLC v. McLeod Health Servs., Inc.*, 773 F. Supp. 2d 622, 626–27, 633 (D.S.C. 2011) (allowing plan administrator's breach of fiduciary duty claim to go forward against the claims administrator of a self-funded plan, "seeking recovery of alleged **overpayments** to a medical provider," "which totaled over $1,000,000) (emphasis added); *Hartsfield, Titus & Donnelly v. Loomis Co.*, No. 08-3329, 2010 WL 596466, at *3–4 (D.N.J. Feb. 17, 2010) (entering summary judgment against the claims administrator of a self-funded plan for "**making** [**three**] **overpayments**," **in the total amount of $85,114.67**, **because the claims administrator** "**did not act with the care and prudence expected under the circumstances**" **and** "**these negligent acts constituted a breach of fiduciary duty**") (emphasis added); *Autonation, Inc. v. UnitedHealthcare Ins. Co.*, 423 F. Supp. 2d 1265, 1268 (S.D. Fla. 2006) (allowing a breach of fiduciary duty claim to go forward on allegations that UnitedHealthcare made "**overpayments**" to medical providers) (emphasis added).

Separate from overpaying claims, **a claims administrator also breaches its duty of prudence by failing to address and correct known flaws in its administration of healthcare claims**. *See, e.g., Comau LLC*, 2020 WL 7024683, at *5, 8 (allowing plan administrator's breach of fiduciary duty claim to go forward on allegations demonstrating that the self-funded plan's claims administrator "breached its fiduciary duty by failing to correct its processing system," which resulted in payment errors); *Autonation*, 423 F. Supp. 2d at 1268, 1270 (allowing breach of fiduciary duty claim to go forward on allegations that UnitedHealthcare failed to address "the flaws in its administration of the [self-funded p]lan" "**even after United**[**Healthcare**] **was made aware of th**[**ose**] **flaws**") (emphasis added); *see also, e.g., Perez v. Chimes D.C., Inc.*, No. 15-3315, 2016 WL 5815443, at *9 (D. Md. Oct. 5, 2016) (explaining that the prudence standard addresses "whether the fiduciary engaged in a reasoned decision-making process").

As a Claims Administrator of the NEMF Plan, UnitedHealthcare assumed fiduciary duties that are "the highest known to the law," *see supra* at 41, and, therefore, a simple negligence standard applies—for which subjective good faith presents no defense. *See supra* at 47. The undisputed evidence demonstrates that UnitedHealthcare was keenly aware of the flaws in its

administration of claims, *see supra* at 8–13, including both "manual" and "system" defects that resulted in "overpayments," among other categories of payment errors. *See supra* at 10–11. Nevertheless, UnitedHealthcare continued to process and pay claims in error.  The court in *Hartsfield* imposed liability on a self-funded plan's claims administrator liable for "making [three] overpayments." *See supra* at 48.  Here, the Trustee has identified, among other negligently-paid claims, $13 million of Overpayments in the Error Categories that Defendants made over the period from 2014 to 2020, *see supra* at 7, and "[i]t is quite obvious that no prudent [claims] administrator would approve claims payments for non-covered claims." *See supra* at 47 (quoting *Grp. 1 Auto.*, 2020 WL 8299592, at \*3).

### c.      **Element 3:  The Losses Defendants Caused to the NEMF Plan**

"[I]n interpreting ERISA, the common law of trusts informs a court's analysis" because "ERISA's fiduciary duties draw much of their content from the common law of trusts." *Tatum*, 761 F.3d at 357 (internal quotation marks and citations omitted).  The ERISA standards for establishing loss causation mirror those of trust law and, therefore, once a plaintiff shows that a "a fiduciary … breached his fiduciary duty and a loss is established, [the fiduciary] bears the burden … on loss causation." *Id*. at 362.  In other words, the burdens of "production and persuasion" "shift[] to the fiduciary to prove that the loss was not caused by … the breach of duty." *Id*. at 361–62; *see also Sims*, 2018 WL 3128996, at \*5 ("Once the plaintiff meets [its] low burden, the burden shifts to the defendants to disprove loss.").[14]

### A.      **Disgorgement of Defendants' Compensation**

"Disgorgement" is a traditional remedy under the common law of trusts. *See, e.g.*, Restatement (Third) of Trusts § 100 (2012) (explaining that a "**trustee who commits a**

---

[14]      Defendants retained Dr. Kongstvedt to offer a generic opinion that some "amount would have been payable under the NEMF [P]lan" even if Defendants had not negligently paid a claim. *See* Ex. T-55 at ¶ 13.b.  At his deposition, however, Dr. Kongstvedt confirmed that he had *no* "opinion with respect to what … should have been paid on any of the claims at issue" if those claims had not been paid in error in the first place. *See* Ex. T-57, 09/29/22 Kongstvedt Depo. at 117:3–117:7.  As a result, **Defendants have not come forward with *any* evidence to meet their burden and disprove the Trustee's asserted losses to the NEMF Plan**.

**breach of trust is chargeable with** … **the amount of <u>any</u> benefit to the trustee personally**")
(emphases added); *id*. at cmt. c ("The prophylactic aims of fiduciary duty **require a fiduciary to
disgorge profits** (including consequential gains) even if the breach of duty is inadvertent.")
(emphasis added) (internal quotation marks omitted); BOGERT, *Trusts and Trustees* § 543 (2022)
(explaining that, upon a breach of fiduciary duty, the trustee "will be required to account for <u>any</u>
income or profits received personally</u>") (emphases added).

    The Trustee's lawsuit seeks "relief under section 1109 of [Title 29]." *See* 29 U.S.C. §
1132(a)(2).  The District Court for the Eastern District of Virginia has long recognized that section
1109 "provide[s] for … the **disgorgement of <u>any</u>** assets and related **<u>profits</u> by the
fiduciary/trustee**." *Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Va.*, 876 F. Supp. 809,
816 n.10 (E.D. Va. 1995) (emphasis added).  Likewise, the Trustee's lawsuit also seeks "other
appropriate **equitable relief**." *See* 29 U.S.C. § 1132(a)(3) (emphasis added).  The disgorgement
remedy also is available under section 1132(a)(3). *See Peters*, 2 F.4th at 238 ("Under traditional
rules of equity, a defendant who owes a fiduciary duty to a plaintiff may be forced to **disgorge
<u>any</u> profits** made by breaching that duty.") (emphasis added) (quoting *Parke v. First Reliance
Standard Life Ins. Co.*, 368 F.3d 999, 1008–09 (8th Cir. 2004)); *see also id*. at 217 (explaining that
"[d]isgorgement" **is "an equitable remedy meant to prevent the wrongdoer from enriching
himself by his wrongs**," "**even if the breach of fiduciary duty is inadvertent or caused no
loss**") (emphasis added) (internal quotation marks and citations omitted).

    Here, while repeatedly breaching their fiduciary duties of loyalty and prudence, and
wrongfully withholding information from the Plan Administrator of the NEMF Plan, Defendants
received at least **<u>$9,687,713</u>** of compensation over the period from 2014 to 2020. *See supra* at 27.
The Court, therefore, should disgorge this compensation from Defendants.

      **B.**    <u>**Damages Resulting from Defendants' Breaches**</u>

    By breaching their fiduciary duties and causing losses to the NEMF Plan, Defendants are
liable for those losses:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any **losses to the plan resulting from each such breach** … and shall be subject to such other equitable or remedial relief as the court may deem appropriate ….

29 U.S.C.A. § 1109(a) (emphasis added).

Under Count I of the FAC, the Court should enter summary judgment against Defendants in an amount of at least **$11,570,866** for the NEMF Plan losses Defendants caused, over the period from 2014 to 2020, by breaching their duty of prudence and negligently processing and paying healthcare claims; Defendants have no genuine dispute remaining for trial concerning these damages. *See supra* at 6–8. The Trustee respectfully submits that the damages Defendants caused by breaching their duty of loyalty and duty to disclose material information would be duplicative of the Error Category (and Supplemental Error Category) damages the Trustee has identified in this case. If Defendants had honored their duty to disclose material information, NEMF would have been able to prevent the losses Defendants caused. Likewise, if Defendants had not breached their duty of loyalty—including by misrepresenting their annual performance—NEMF would have been able to address the losses Defendants caused to the NEMF Plan.

### C.     COUNT II:  DEFENDANTS' INTENTIONAL CONCEALMENT OF EVIDENCE

Under Count II of the FAC, the Trustee seeks relief for Defendants' intentional concealment of evidence in this case. *See* FAC at 68–72. New Jersey courts describe this cause of action as "fraudulent concealment" because it is "a type of fraud claim[.]" *See Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1191 n.6 (N.J. 2008); *see also, e.g., Rosenblit v. Zimmerman*, 766 A.2d 749, 757 (N.J. 2001) (explaining that the claim is a form of the "tort of fraudulent concealment, adapted to address concealment … during or in anticipation of litigation").

Although Count II addresses Defendants' sweeping litigation strategy to withhold evidence in this case, the Trustee seeks a partial summary judgment concerning one category of information that Defendants concealed from him: **the Claims Information**. *See supra* at 33 (identifying same). The Trustee has established that Defendants breached their fiduciary duties and caused significant losses to the NEMF Plan. However, if the Court determines that the Trustee is unable to establish

any portion of the NEMF Plan's losses without the Claims Information, the Trustee will have suffered an injury in this litigation and the Court should enter a partial summary judgment against Defendants under Count II.  In doing so, the Court should award the Trustee (i) _compensatory_ _damages_ representing the NEMF Plan's losses that the Trustee could not establish without the Claims Information, and (ii) _punitive damages_ in an amount to be determined by the Court, in its discretion.

### 1.      The Court Has Jurisdiction over Count II

"The district courts have original jurisdiction over cases governed by ERISA …." *Vazquez v. Paul Revere Life Ins. Co.*, 289 F. Supp. 2d 727, 730 (E.D. Va. 2001).  The Court, therefore, has been exercising supplemental jurisdiction over Count II: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy …."  28 U.S.C.A. § 1367(a) (1990).  The two claims in this case collectively address Defendants' concealment of material information from NEMF (under Count I, pursuant to ERISA) and Defendants' concealment of material information from the Trustee (under Count II, pursuant to New Jersey law).  As the Trustee previously observed, "although there are two counts that deal with concealment," "the evidence is largely the same" because Defendants' concealment of information emanates from a single, institutional "policy of nondisclosure." *See* Dkt. 162, 11/30/22 Hearing Tr. at 82:14–82:20, 83:4–84:5.

Although a district court "may decline to exercise supplemental jurisdiction over a claim … if … (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction," *see* 28 U.S.C.A. § 1367(c)(1)–(4), each of these factors warrants the Court's continued exercise of jurisdiction over Count II.

The relief the Trustee seeks under Count II is neither novel nor complex but, instead, is based upon a well-developed and easily-applied body of case law. *See infra* at 54–55; *see also* Dkt. 101 at ECF pp. 28–29 (Defendants moving to dismiss on the merits and addressing the "five elements" of "fraudulent concealment under New Jersey law") (citing *Rosenblit*, 766 A.2d 749; *27-35 Jackson Ave., LLC v. Samsung Fire & Marine Ins. Co.*, 263 A.3d 200 (N.J. Super. App. Div. 2021); *Tartaglia*, 961 A.2d 1167).   Further, the Trustee's ERISA claim under Count I is the predominant claim in this case and the sole claim the Trustee asserted when he commenced this action. *See* Dkt. 1.  Finally, the Court previously denied Defendants' motion to dismiss Count I— over which it exercises original jurisdiction—and there are no reasons to decline jurisdiction over Count II; to the contrary, as the Trustee argued in his opposition to Defendants' motion to dismiss, Count II "is grounded in discovery misconduct that took place … in this action and, therefore, Defendants incorrectly assert that 'the Court has no interest in adjudicating Count II of the FAC.'" *See* Dkt. 118 at ECF p. 30 (citing Dkt. 101 at ECF p. 29).

In addition to meeting these standards, federal courts regularly exercise jurisdiction over fraudulent concealment claims arising under New Jersey law. *See, e.g., loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 239–40 (D.N.J. 2019) (denying defendants' motion to dismiss plaintiff's claim for fraudulent concealment under New Jersey law); *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 320–23 (3d Cir. 2014) (reversing the district court's dismissal of a fraudulent concealment claim under New Jersey law on facts demonstrating that the plaintiffs were harmed in litigation "by having to rely on an evidentia[ry] record that did not contain the evidence defendant[s] concealed") (internal quotation marks and citation omitted).

## 2. It Is Undisputed that New Jersey Law Applies to Count II

It is undisputed that New Jersey governs the Trustee's fraudulent concealment claim under Count II of the FAC.  In moving to dismiss both claims in the FAC, Defendants asserted that Count II addresses a "state law claim arising under New Jersey law, relating to a contract [*i.e.*, the ASA] governed by New Jersey law, and asserted by [the] Trustee appointed by the U.S. Bankruptcy Court for the District of New Jersey." *See* Dkt. 101 at ECF p. 29 (internal citations

omitted); *see also, e.g., id.* at 27–29 (Defendants conceding that Count II arises "solely under New Jersey state law" and arguing, on the merits, that the Trustee cannot satisfy each of the "five elements" of "fraudulent concealment under New Jersey law") (citing *Rosenblit*, 766 A.2d 749; *27-35 Jackson Ave., LLC*, 263 A.3d 200; *Tartaglia*, 961 A.2d 1167); Dkt. 121 at ECF p. 21 (in their reply memorandum, Defendants asserting that the Trustee "cannot establish the element of causation" under New Jersey law) (citing *27-35 Jackson Ave., LLC*, 263 A.3d 200).  Likewise, Defendants separately advised the Court in their "science day" submission that New Jersey law applies. *See* Dkt. 149 at 45 (citing *Rosenblit*, 766 A.2d 749).[15]

### 3.  Intentional Concealment under New Jersey Law

Under New Jersey law, when "an adversary has intentionally hidden … evidence necessary to a party's cause of action and that misdeed is uncovered in time for trial, [the] plaintiff is entitled to … amend his or her complaint to add a claim for fraudulent concealment." *Rosenblit*, 766 A.2d at 760.  That is because "'[s]uch conduct cannot go undeterred and unpunished and those aggrieved by it should be made whole … and, if the elements of the Punitive Damages Act are met, punitive damages for intentional wrongdoing'" are available. *Williams*, 765 F.3d at 320 (quoting *Rosenblit*, 766 A.2d at 754); *see also Robertet Flavors, Inc. v. Tri-Form Const., Inc.*, 1 A.3d 658, 671 (N.J. 2010) (explaining that the purpose of the claim is "'to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct'") (quoting *Rosenblit*, 766 A.2d at 749).[16]

---

[15]    As Defendants correctly observe, the ASA "is governed by … the laws of the State of New Jersey," *see* Ex. T-1, ASA at § 15.3, and the "rights" the Bankruptcy Court bestowed on the Trustee—including the right to pursue claims and causes of action—are "governed by … the laws of the State of New Jersey." *See* Dkt. 1-1, Confirmation Order at ¶ 32.  Thus, New Jersey law governs Count II. *See, e.g., Self Insured Servs. Co. v. Panel Sys., Inc.*, 352 F. Supp. 3d 540, 551–52 (E.D. Va. 2018) (Novak, J.) (explaining that courts will "honor[] the intent of the parties to choose the applicable law" and that governing-law provisions in contracts are "sufficiently broad to cover contract-related torts").

[16]    The New Jersey courts have explained that a cause of action for fraudulent concealment typically is an alternative "remedy" for a "spoliation inference" (or "adverse inference") imposed as a sanction for discovery misconduct. *See, e.g., Rosenblit*, 766 A.2d at 758 (discussing same);

To establish a claim for fraudulent concealment, the plaintiff must show the following:

(1)    the defendant had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2)    the evidence was material to the litigation;

(3)    the plaintiff could not reasonably have obtained access to the evidence from another source;

(4)    the defendant intentionally withheld, altered, or destroyed the evidence with purpose to disrupt the litigation; and

(5)    the plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Williams*, 765 F.3d 306, 320–21 (alteration to form) (citing *Rosenblit*, 766 A.2d at 758); *see also Tartaglia*, 961 A.2d at 1188 (same).  The Trustee has established his claim under Count II.

### a.    Defendants Were Obligated to Produce the Claims Information

For two reasons, Defendants had a legal obligation to disclose and produce the Claims Information to the Trustee.  ***First***, on November 12, 2021—nine months before the close of fact discovery in this case—the Trustee requested Defendants' productions of the Claims Information pursuant to the Federal Rules of Civil Procedure. *See supra* at 32.  And, of course, Defendants were aware, no later than the April Hearing, that they were required to produce requested discovery to the Trustee. *See, e.g.,* Dkt. 57, 04/07/22 Tr. at 3:14–3:16 ("I normally decide discovery disputes off the papers, but I decided to have a hearing on this because the way this has been going is not acceptable and I want to make that clear."); *id*. at 11:10–11:11 ("You're going to have to produce this stuff that they asked for."); *id*. at 16:16–16:17 ("I want the trustee to get … discovery.").

***Second***, Defendants had a special legal obligation imposed upon them to disclose the Claims Information.  ERISA prohibits "an issuer of health insurance coverage" from "enter[ing] into an agreement with a health care provider … that would directly or indirectly restrict a … health insurance issuer … from … providing **provider-specific cost** … **data** … to … the plan

---

*Robertet Flavors*, 1 A.3d 658 at 671 ("Spoliation that becomes apparent during discovery or trial often can be addressed effectively through … adverse inferences.").

sponsor [*i.e.*, NEMF]." *See* 29 U.S.C. § 1185m(a)(1)(A) (2020).[17]  Much of the Claims Information—such as "provider contracts," "[p]rovider" "bills," "payment policies," "reimbursement methodology" information and "fee schedules"—explicitly contain provider-specific cost data. *See supra* at 33 (identifying the Claims Information).

Notwithstanding Defendants' two independent legal obligations to produce the Claims Information, they deliberately refused to produce the Claims Information because it constitutes "**trade secrets and/or other non-public information**." *See* Dkt. 46-2 at ECF p. 5 (emphasis added); 46-3 at ECF p. 4 (emphasis added).  In fact, **UnitedHealthcare admitted in discovery that its policy of** "**supply[ing] minimum necessary data**" **is**, **in part**, **designed** "**to protect** [its] **provider contracts**" **because UnitedHealthcare** "**ha[s] agreements with** [its] **providers** … **that** [it] **will keep contracted rates confidential**." *See* Ex. T-40, 06/27/22 Brown Depo. at 49:2–49:7 (emphasis added).  Even one of Defendants' expert witnesses was unmoved by the notion that Defendants concealed the Claims Information from the Trustee. *See, e.g.*, Ex. T-58, 09/23/22 Travis Depo. at 81:9–81:11, 84:10–84:12 (testifying that "**allowed amounts** can certainly be one of those fields that can be considered confidential and proprietary information" and "**it would not surprise me if it was not** [**produced**] because of its confidential and proprietary nature") (emphasis added); *id*. at 153:6–153:16 (testifying that Defendants' productions with "missing" data may have been "intentional" if Defendants "determined [the data] was confidential and proprietary and they chose not to include it"); *see supra* at 5 n.3, 24 n.12 (discussing "allowed amounts").

Defendants have no justification for disregarding their disclosure obligations under the Federal Rules and ERISA on the ground that the Claims Information is "confidential."  The parties negotiated, and the Court entered, a *Stipulated Protective Order* in this case to protect "proprietary business and trade secret information related to Defendants' business and associated business operations." *See* Dkt. 44 at 2.  Defendants should have produced the Claims Information.

---

[17]     ERISA defines a "health insurance issuer" as "an insurance company." *See* 29 U.S.C. § 1191b(b)(2) (2016).

**b.**   **Defendants Contend the Claims Information Is Material**

Defendants' three expert witnesses collectively have six opinions that, because Defendants refused and failed to produce the Claims Information to the Trustee in discovery, the Trustee cannot prove that UnitedHealthcare made any payment errors. *See supra* at 37–40.

**c.**   **Defendants Are in Possession of the Claims Information**

Defendants acknowledge that they are in possession of the Claims Information, which is "contained in individual claim files stored across multiple United[Healthcare] systems," including the TOPS/UNET System. *See supra* at 20.  In fact, Defendants relied on Claims Information for the 250-claim Discovery Sample they kept secret from the Trustee, the Court and the Special Master until the end of July 2022. *See supra* at 35–36.

**d.**   **Defendants Intentionally Withheld the Claims Information**

Defendants intentionally concealed the Claims Information from the Trustee in discovery on the grounds that: (i) the Trustee was not entitled to the Claims Information, *see supra* at 33–35; (ii) the Claims Information was "irrelevant," *see supra* at 33–35; (iii) the Claims Information is "confidential" and "proprietary," *see supra* at 56; and (iv) the only information the Trustee needed, and was entitled to receive, was the Underlying Data. *See supra* at 34.  Then, in July 2022, Defendants announced that they would be producing their Discovery Sample—and that the Discovery Sample would include Claims Information for the 250 healthcare claims that Defendants handpicked to attempt to extrapolate-away the Trustee's findings. *See supra* at 35–36.

**e.**   **The Trustee's Damages from Defendants' Concealment**

"New Jersey courts have explained that a spoliation injury may exist when the [subject mis]conduct affects the size or existence of a damages award at trial." *Williams*, 765 F.3d at 321 (citing *Tartaglia*, 961 A.2d at 1190).  In other words, a plaintiff must prove that he "was harmed in the underlying action by having 'to rely on an evidential record that did not contain the evidence defendant concealed.'" *Williams*, 765 F.3d at 323 (quoting *Rosenblit*, 766 A.2d at 758).  Accordingly, before a court may enter a damages award on a fraudulent concealment claim, the court must first rule on the plaintiff's main claim (*i.e.*, the claim affected by the withheld evidence).

*See Rosenblit*, 766 A.2d at 758 (explaining that the plaintiff's "access to … remedies … will depend upon" the outcome of the plaintiff's main claim).

If the plaintiff prevails on his main claim, he cannot obtain a "duplicative recovery" and, therefore, may "recover … compensatory damages limited to the … costs of proceeding without the [missing] evidence, or costs incurred in an effort to replace that evidence, together with, if appropriate, a punitive award." *See Tartaglia*, 961 A.2d at 1190.  For the same reason, if the court imposes an "adverse inference" charge at trial on the plaintiff's main claim, the plaintiff's recovery likewise will be limited. *See, e.g., Novembre v. New Jersey Nets*, No. A-3313-15T3, 2019 WL 3230868, at *5 (N.J. Super. Ct. App. Div. July 18, 2019) (explaining that an "adverse inference" discovery sanction constitutes a "substantive remedy" because the court will decide the main claim "as if [the missing] evidence assisted the plaintiff") (quoting *Tartaglia*, 961 A.2d at 1189).

However, if the plaintiff does *not* prevail on his main claim (or the court does not impose an adverse-inference charge on the plaintiff's main claim), the damages available on the fraudulent concealment claim include "spoliation-based damages" and "punitive damages." *See Tartaglia*, 961 A.2d at 1190; *see also, e.g., Robertet Flavors*, 1 A.3d at 671 (explaining that a fraudulent concealment claim is designed "'**to make whole** … the litigant whose cause of action has been impaired by the absence of crucial evidence'") (emphasis added) (quoting *Rosenblit*, 766 A.2d at 754).  Thus, if the Court determines that the Trustee is unable to establish any portion of the NEMF Plan's losses without the Claims Information, all of the elements of the Trustee's claim under Count II will be satisfied.  In that event, the Court should fix a damage award representing the NEMF Plan's losses that the Trustee could not establish without the Claims Information.

### 4.    The Trustee Is Entitled to Punitive Damages

"'[I]f the elements of the Punitive Damages Act [(the '**Act**')] are met, punitive damages for intentional wrongdoing'" are available on a claim for fraudulent concealment. *Williams*, 765 F.3d at 320 (quoting *Rosenblit*, 766 A.2d at 758).  Pursuant to the Act,

> a.    Punitive damages may be awarded … only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions

were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions….

b.  In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:

(1)  The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2)  The defendant's awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3)  The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4)  The duration of the conduct or any concealment of it by the defendant.

N.J. REV. STAT.§ 2A:15-5.12.a–b (1995); *see also Viviano v. CBS, Inc.*, 597 A.2d 543, 547, 551–52 (N.J. Super. Ct. App. Div. 1991) (affirming a $215,000 punitive damages award against a defendant for concealing an internal memorandum that "**contained the key information plaintiff needed** to recover for her injuries," and "hold[ing] that there was sufficient basis … for the … award of punitive damages" because "[t]here was substantial evidence of intentional wrongdoing in the sense of … an act accompanied by wanton and willful disregard of the rights of another").

The Trustee initiated discovery in this case on November 12, 2021 by serving the Production Requests on Defendants and seeking Underlying Data and the Claims Information. *See supra* at 32.  Although Defendants now assert that the Claims Information is critical and that the Trustee cannot prove any payment errors without it, *see supra* at 37–40, Defendants refused to produce it—except for their handpicked, 250-claim Discovery Sample. *See supra* at 35–36.  On this record, the Court should award the Trustee punitive damages.  For any such award, the Court must "consider all relevant evidence," including: (1) "[a]ll relevant evidence relating to the [four] factors set forth [above in section 2A:15-5.12.b of the Act]"; (2) "[t]he profitability of the misconduct to the defendant"; (3) "[w]hen the misconduct was terminated"; and (4) "[t]he financial condition of the defendant." N.J. REV. STAT. § 2A:15-5.12.c.

In the Error Categories alone, the Trustee has identified millions of dollars of losses Defendants caused to the NEMF Plan by negligently approving and paying the healthcare claims. Defendants sought to prevent the Trustee from proving those significant losses by making untimely productions of Underlying Data and withholding all Claims Information from the Trustee. Defendants' misconduct continues as of this filing: notwithstanding the Preclusion Orders in this case, *see supra* at 7, Defendants intend to elicit testimony from each of their three experts that the Trustee cannot prove any payment errors because they concealed the Claims Information in discovery. *See supra* at 37–40. Defendants also intend to elicit testimony from Mr. Cannon about the Claims Information they voluntarily produced for their handpicked, 250-claim Discovery Sample. *See supra* at 38. UnitedHealthcare "is one of the largest claims administrators in the United States" and "provides health care benefits coverage and administrative services for more than 47.8 millions Americans." *See* Dkt. 149 at 1. UnitedHealthcare has ample resources—and no excuse for refusing and failing—to comply with its disclosure obligations before this Court. Punitive damages are warranted.

## IV.   <u>CONCLUSION</u>

The Court should enter a partial summary judgment against Defendants, jointly and severally, under Count I, for UnitedHealthcare's breaches of its duties of prudence and loyalty and its duty to disclose material information. The Trustee requests that the Court award damages under Count I in an amount of at least <u>**$11,570,866**</u>, in addition to a judgment disgorging all compensation Defendants received over the period from 2014 to 2020, in an amount of not less than <u>**$9,687,713**</u>. Alternatively, if the Court determines that the Trustee is unable to establish any portion of the NEMF Plan's losses without the Claims Information, the Court should enter a judgment under Count II against Defendants, jointly and severally, with damages representing the NEMF Plan's losses that the Trustee could not establish without the Claims Information. In that event, the Court also should impose punitive damages against Defendants.

Dated: February 10, 2022

KEVIN CLANCY, IN HIS CAPACITY AS THE LIQUIDATING TRUSTEE OF THE NEW ENGLAND MOTOR FREIGHT LIQUIDATING TRUST

/s/ *Vernon E. Inge, Jr.*
Vernon E. Inge, Jr.

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Whiteford, Taylor & Preston, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3301
Facsimile:     804.977.3291
E-Mail:        vinge@wtplaw.com

Scott M. Hare (*admitted pro hac vice*)
Whiteford, Taylor & Preston, L.L.P.
11 Stanwix Street, Suite 1400
Pittsburgh, Pennsylvania 15222
Telephone:     412.275.2399
Facsimile:     412.275.2406
E-Mail:        share@wtplaw.com

Todd M. Brooks (*admitted pro hac vice*)
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street, 15th Floor
Baltimore, Maryland 21202
Telephone:     410.347.9421
Facsimile:     410.234.2318
E-Mail:        tbrooks@wtplaw.com

Joshua D. Stiff (Va. Bar No. 86105)
Whiteford, Taylor & Preston, L.L.P.
249 Central Park Avenue, Suite 300
Virginia Beach, Virginia 23462
Telephone:     757.271.9751 / 804.762.6870
Facsimile:     757.271.9736
E-Mail:        jstiff@wtplaw.com

*Special Litigation Counsel for Plaintiff, Kevin P. Clancy,*
*in his capacity as the Liquidating Trustee*
*of the New England Motor Freight Liquidating Trust*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 10, 2022, a copy of the foregoing was served on the following counsel for the parties by electronic mail:

Rochelle-Leigh Rosenberg
Christopher Flynn
Samuel H. Ruddy
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:     202.624.2500
Facsimile:     202.628.5116
E-Mails:        rrosenberg@crowell.com
                cflynn@crowell.com
                sruddy@crowell.com

*Counsel for Defendants*
*UnitedHealthcare Insurance Company*
*and HPHC Insurance Company, Inc.*

Thomas F. Koegel
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone:     415.986.2800
Facsimile:     415.986.2827
E-Mail:         tkoegel@crowell.com

*Counsel for Defendants*
*UnitedHealthcare Insurance Company*
*and HPHC Insurance Company, Inc.*

Lewis Franklin Powell, III
Maya Miriam Eckstein
Hunton Andrews Kurth LLP
951 E. Byrd Street
Riverfront Plaza
Richmond, VA 23219
Telephone:     804.788.8788
Facsimile:     807.788.8218
Emails:         lpowell@hunton.com
                meckstein@hunton.com

*Counsel for Defendants*
*UnitedHealthcare Insurance Company*
*and HPHC Insurance Company, Inc.*

Andrew Holmer
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone:     213.443.5509
Facsimile:     213.622.2690
E-Mail:         aholmer@crowell.com

*Counsel for Defendants*
*UnitedHealthcare Insurance Company*
*and HPHC Insurance Company, Inc.*

/s/ *Vernon E. Inge, Jr.*
Vernon E. Inge, Jr.